Jessner, Plaintiff in error, vs. The State, Defendant in error.

*April 5—October 14, 1930.*

For the plaintiff in error there was a brief by *Wylie & Whipple* of Madison, and oral argument by *Fred M. Wylie* and *Herbert E. Whipple*.

For the defendant in error there was a brief by the *Attorney General, Philip F. La Follette,* special assistant counsel, and *J. E. Messerschmidt,* assistant attorney general, and oral argument by *Mr. Messerschmidt* and *Mr. La Follette.*

The following opinion was filed June 23, 1930:

OWEN, J. Plaintiff in error (hereinafter called the defendant) was convicted of murder in the first degree. The sufficiency of the evidence to support the verdict is not challenged. The errors which it is claimed require a reversal

of the judgment are those arising during the course of the trial. The most important and conclusive of these presents the question of the constitutionality of sec. 357.12, Stats., appearing in the margin.[1]

Experts were appointed by the court to investigate and report upon the sanity of the defendant at the time of the trial, and were later called to testify concerning his sanity at the time of the commission of the act, all under and in accordance with the provisions of this statute. It is claimed that this statute violates various constitutional provisions, all designed to protect the rights of accused persons, and that the use made of these experts upon the trial was an invasion of the defendant's constitutional rights and deprived him of a constitutional trial.

The assault thus made upon this statute is highly important. Its enactment was in response to a well-settled con-

---

[1] 357.12 *Expert witnesses.* (1) *Experts to be appointed by judge.* Whenever, in any criminal case, expert opinion evidence becomes necessary or desirable the judge of the trial court may after notice to the parties and a hearing, appoint one or more disinterested qualified experts, not exceeding three, to testify at the trial. Before entering upon such investigation such experts shall take and subscribe the following oath, before the judge making the appointment or some officer designated by him: "I do solemnly swear that I will make a faithful and impartial examination of the matters to be investigated by me and that I will make a true report thereon according to the best of my knowledge, belief and understanding. So help me God." The compensation of such expert witnesses shall be fixed by the court and paid by the county upon the order of the court as a part of the costs of the action. The receipt by any expert witness summoned under this section of any other compensation than so fixed by the court and paid by the county, or the offer or promise by any person to pay such other compensation shall be unlawful and punishable as contempt of court. The fact that such expert witnesses have been appointed by the court shall be made known to the jury, but they shall be subject to cross-examination by both parties, who may also summon other expert witnesses at the trial, but the court may impose reasonable limitations upon the number of witnesses who may give opinion evidence on the same subject.

(2) *Experts to examine accused.* No testimony regarding the mental condition of the accused shall be received from witnesses

viction that, in criminal cases at least, where the interests of society were involved, there should be some technical evidence from unprejudiced and reliable sources. This conviction grew out of the belief that under the then existing procedure there was a striking tendency on the part of experts to accommodate their opinions to the necessities of that side of the case upon which they were testifying, and that such opinions were to a very large extent prejudiced and unreliable. To secure the reliable and unprejudiced opinions of the ablest experts in such cases, to the end that the purest degree of justice might be promoted, the Board of Circuit Judges sponsored the enactment of this statute. If this statute must be condemned as unconstitutional, it will require retracement of most significant forward steps in judicial procedure, and bring regret to all who believe in steady progress towards the attainment of a more perfect justice.

---

summoned by the accused until the expert witnesses summoned by the prosecution have been given an opportunity to examine and observe the accused, if such opportunity shall have been seasonably demanded.

(3) *Accused may be committed to hospital.* Whenever the existence of mental disease on the part of the accused, at the time of the trial, is suggested or becomes the subject of inquiry, the presiding judge of the court before which the accused is to be tried or is being tried may, after reasonable notice and opportunity for hearing, commit the accused to a state or county hospital or asylum for the insane to be detained there for a reasonable time, to be fixed by the court, for the purpose of observation, but the court may proceed under section 357.13. In case of commitment to a hospital the court shall direct the superintendent of the hospital to permit all the expert witnesses summoned in the case to have free access to the accused for the purpose of observation. The court may also direct the chief physician of the hospital to prepare a report regarding the mental condition of the accused. This report may be introduced in evidence at the trial under the oath of the said chief physician who may be cross-examined regarding the report by counsel for both parties.

(4) *Experts, written reports of.* Each expert witness appointed by the court may be required by the court to prepare a written brief report under oath upon the mental condition of the person in question and such report shall be filed with the clerk at such time as may be fixed by the court. Such report may with the permission of the court be read by the witness at the trial.

The challenge of the constitutionality of the statute is most vigorous and intelligent, fortified by cogency of logic, supported by an array of authorities (important, however, only by way of analogy) that not only bespeaks the industry of counsel but arouses most earnest consideration. First of all, it is said that the statute violates sec. 8, art. I, of our constitution, prohibiting compulsory self-incrimination. This contention is based upon a construction of the law which, it is argued, authorizes such an observation, examination, and investigation of the accused as constitutes an invasion of the rights of privacy which constitutional provisions against unreasonable search and exemption of accused from being a witness against himself protect.

In answer to this contention the able special counsel who prosecuted the case in the trial court maintains that the constitutional provision against self-incrimination does not apply to the question of the sanity of the accused; that it protects the accused from supplying any link in the chain of evidence to establish the conclusion that he committed the act which the law denounces, but that it has no application to the inquiry as to his mental responsibility at the time the act was committed; that his mental responsibility becomes a separate and distinct issue when the accused introduces the defense of insanity, and that although his ultimate guilt depends upon his mental condition at the time of the commission of the act, it has no bearing upon the question of whether he committed the act, and that the issue voluntarily tendered necessarily involves an investigation of and an inquiry into matters which are essentially and sacredly personal. In other words, the issue thus tendered invites an inquiry into the mental condition of the accused at the time of the commission of the offense. He is presumed to have been sane unless he voluntarily claims otherwise, and upon making that claim he cannot frustrate a complete investigation and examination by which alone the truth may be

known.   The cogency of this contention is appreciated, but as we prefer to base our decision on other grounds we express no opinion with reference thereto.

If any violation of the constitutional rights of the accused is authorized by the statute under consideration, it must be ascribed to the provision which authorizes his commitment to a hospital for the insane for the purposes of observation, and to the provisions of the oath prescribed in sub. (1), by which the appointees pledge themselves to make a faithful and impartial examination of the matters to be investigated. Medical authorities are cited to the proposition that an adequate examination of one suspected of insanity must be made upon both subjective and objective symptoms, may require an examination of his books and papers, and that the "investigation," "examination," and "observation" spoken of in the statute necessarily includes an invasion of the right of privacy which the constitutional provision against unreasonable search and exemption of an accused from being a witness against himself protects.

*Thornton v. State,* 117 Wis. 338, 93 N. W. 1107, is a very well considered case treating philosophically and historically the sources of · these constitutional provisions. While it is the duty of courts to jealously protect the rights which these constitutional provisions afford accused persons, it is pointed out that because a fact pertains to or is connected with the person of an accused it is not necessarily secret, and that the personal characteristics of an accused which are commonly open and observable to all are not of that secret nature which the constitutional provisions we are discussing were designed to protect.   For instance, a person may be required to stand up in court so that he may be identified.   He may be required to remove his hat so that it may be ascertained whether he is bald, and that case held that it was not error to require an accused to deliver to witnesses his shoes for the purpose of comparing them with

footprints found near the place of the crime. If this statute be susceptible to a construction of legislative attempt to compel an accused to submit his person, his property or effects to an unconstitutional inspection or investigation, certainly such a construction is not compelling, and it is needless to · say that it should not be so construed as to render it unconstitutional, if another construction is permissible. It is here construed as authorizing the experts appointed by the court to make such investigations and examinations only as are consistent with the constitutional rights of the accused without any attempt at this time to set the limits of such rights. Whatever those rights are, there is no contention here that they were violated by the experts appointed and permitted to testify in this case. Their appointment by the court and their examination of the defendant were with and by the consent of the defendant. Their testimony cannot be said to be based upon facts secured as the result of a violation of any of the constitutional rights of the accused.

It is next contended that the statute violates sec. 7, art. I, of the Wisconsin constitution, guaranteeing a jury trial. This contention is based upon the provision of the law that the fact that such witnesses have been appointed by the court shall be made known to the jury, thus making the court stand sponsor for the credibility and reliability of such experts, which it is claimed is a perversion of that right of trial by jury preserved by the constitution. In support of this contention, industrious counsel have collated numerous decisions from twenty-four states of the Union in which it has been held error for the trial judge not only to give the slightest intimation of his opinion with reference to the merits of the case, but to indicate disparagement or commendation of witnesses or the weight that should be given to the testimony of any particular witness, as well as many other incidents which have been held to constitute an unfair trial and to require a reversal. It is said that the fact that

the experts are appointed by the court, which fact is made known to the jury, necessarily leads the jury to give a sanctity and a weight to their testimony which is not accorded to the other witnesses.

It is not to be denied that many courts of this country do not tolerate any expression of opinion on the part of the trial judge as to the merits of the case, or allow a trial judge to exalt witnesses before the jury, or to make a one-sided summary of the evidence, or to say or do anything or to act in any manner which is intended to convey to the jury any intimation of his views as to the merits of the case, or that it can in any manner have a tendency to influence them in their deliberations. Such is the tendency of this court. *Benedict v. State,* 14 Wis. *423; *Ely v. Tesch,* 17 Wis. *202; *Lela v. Domaske,* 48 Wis. 623, 4 N. W. 794; *Ryan v. State,* 168 Wis. 14, 168 N. W. 566. However, it is believed that these principles are recent developments in accordance with modern views of justice, and in response to the growing notion that our system of jurisprudence commits to the jury the determination of the facts unbiased and uninfluenced by the views or opinions of the trial judge.

That this was not the jury trial of the common law which our constitution preserved, is certain. The principles relied upon are developments in American jurisprudence, in some cases by force of statutes, but in the great majority of cases by the trend of judicial opinion. Neither statutes enacted nor judicial opinions rendered since the adoption of the constitution can impute a different meaning to the constitutional provision than that obviously intended at the time the constitution was adopted. Sec. 7, art. I, of the constitution provides that in all criminal prosecutions the accused shall enjoy the right ". . . to a speedy public trial by an impartial jury of the county or district wherein the offense shall have been committed." The jury referred to in this section is "such a jury as was known to the common law

and to the courts of the territory of Wisconsin before the state was organized." *Bennett v. State,* 57 Wis. 69, 14 N. W. 912, and cases there cited. No attempt is made in the constitution to prescribe the kind of a trial the accused shall have, further than that it shall be a "speedy public trial by an impartial jury." If any limitations are imposed by this constitutional provision upon the character of the trial to which the accused is entitled other than those specifically mentioned, such limitations cannot be greater than those existing at the common law. The only limitations which the common law imposed upon the trial judge in the matter of expressing his opinion with reference to the merits of the case, was that he should make it clear to the jury that they were not bound by his opinion, and that their decision upon the facts was exclusively for them. This seems to have been the rule with reference to both criminal and civil trials. Bishop, New Crim. Proc. § 981; 16 Corp. Jur. p. 939; *Carver v. Jackson,* 4 Pet. 1, 80; *Magniac v. Thompson,* 7 Pet. 348, 390; *Mitchell v. Harmony,* 13 How. 115; *Transportation Line v. Hope,* 95 U. S. 297; *Vicksburg & M. R. Co. v. Putnam,* 118 U. S. 545, 7 Sup. Ct. 1; *Durkee v. Marshall,* 7 Wend. (N. Y.) 312; *Dows v. Rush,* 28 Barb. (N. Y.) 157; *Powell v. Jones,* 42 Barb. (N. Y.) 24.

In *Magniac v. Thompson,* 7 Pet. 348, at p. 390, the court condemns the practice of bringing up the entire charge; "for as to the comments of the court upon the evidence, it is almost unnecessary to say, after what was said by this court in *Carver v. Jackson,* 4 Pet. 80, 81, that we have nothing to do with them." It is common legal knowledge that at the present time in all of the federal courts as well as many of the state courts and in the courts of England, the trial judge freely discusses the evidence, pointing out the weakness and the strength thereof, and, if he feels so disposed, expresses his own opinion, and that, under existing rules in those courts, or at least many of them, such practice is

not error providing, always, the jury is given to understand that they are not bound by such expressions of opinion and that the ultimate decision is left exclusively to them.

By the statute under consideration the legislature has deliberately attempted to regulate the subject of expert evidence in criminal trials, to the end that there may be some evidence in the case, not bought and paid for, coming from impartial witnesses who owe no duty or allegiance to either side of the controversy, and that the fact of their impartiality shall be made known to the jury. Whether the sponsoring of any witness by the court is good public policy is no longer a matter of judicial opinion. The dominant opinion of the legislature upon that subject has received expression, and its expression upon matters of public policy prevails unless it contravenes constitutional provisions. We find no constitutional provision relating to jury trials which prohibits the practice thus prescribed by the legislature.

It is next contended that the statute is unconstitutional because it imposes upon the court the non-judicial function of appointing experts. While the appointing power is generally regarded as an administrative or executive function, that it is wholly a non-judicial function is negatived by numerous decisions of this court. In the case of *In re Janitor of Supreme Court,* 35 Wis. 410, it was declared that the power of the court to appoint its janitor was inherent. In *Foster v. Rowe,* 128 Wis. 326, 107 N. W. 635, it was held that power conferred upon circuit judges to appoint commissioners to equalize county valuations of property for taxation was not a non-judicial function. In *State ex rel. Gubbins v. Anson,* 132 Wis. 461, 112 N. W. 475, it was held that the power to appoint jury commissioners might be conferred upon circuit judges, and in *Stone v. Little Yellow D. Dist.* 118 Wis. 388, 95 N. W. 405, the power conferred upon circuit courts to appoint drainage commissioners was upheld. In *In re Appointment of Revisor,* 141 Wis. 592,

124 N. W. 670, sustaining the power of the supreme court to appoint a revisor of the statutes, it is said:

"Appointment to office, while generally called an executive function, cannot under our constitution be classed as exclusively a function of either of the three great departments. . . . It is frequently spoken of as typically an executive power; but when in the execution of their proper duties it becomes necessary or proper for either the legislative or judicial department of the government to have administrative acts performed by assistants, such assistants may properly be selected by the legislature or judiciary, as the case may be, provided the constitution does not otherwise direct."

The function of these experts is to aid in the administration of justice, by furnishing reliable and unprejudiced opinions upon a technical subject. The whole purpose of their creation and appointment is to promote the accomplishment of the very purposes for which courts are established. This is accomplished not independently of but within and under the direction of the court, and in conformity with the practices of the court. For the purposes of that particular trial they are a part of the machinery of the court. They render assistance to the court. These considerations lead to the conclusion that their appointment is a most appropriate judicial function. The statute cannot be condemned on this ground.

It is next contended that the statute is unconstitutional because it invades the province of the district attorney. To sustain this contention it is said that an implied constitutional duty devolving upon the district attorney is to prepare the case on the part of the State, and that he, and he alone, is to determine what experts shall be called to testify on behalf of the State. While the constitution does not attempt to define the duties or the powers of the district attorney, it is said that as the constitution conferred upon the office of sheriff "those generally recognized duties and func-

tions belonging to it in this country" (*State ex rel. Kennedy v. Brunst,* 26 Wis. 412; *State ex rel. Milwaukee County v. Buech,* 171 Wis. 474, 177 N. W. 781), so did it confer similar functions and duties upon the district attorney.

In the first place, this statute does not interfere with the right of the district attorney to call on behalf of the State such experts as he sees fit. The experts provided by this law are not experts on behalf of either the State or the accused. It may be granted that, generally speaking, the power conferred upon the district attorney by the constitution includes the power to represent the State in criminal cases. In so doing, however, he must conform to established judicial procedure. To say that neither the legislature nor the courts can work reform in judicial procedure because the constitution established the office of district attorney is to give most remote and fanciful potency to that provision of the constitution.

Having considered all of the objections raised to the constitutionality of this statute, we arrive, without hesitation, at the conclusion that this statute offends against no constitutional provision, and that its enactment was well within legislative power. This conclusion finds support in *State v. Horne,* 171 N. C. 787, 88 S. E. 433. *People v. Dickerson,* 164 Mich. 148, 129 N. W. 199, is to the contrary. These are the only two cases dealing with a similar statute coming to our attention.

A further contention requiring consideration is that the court erred in instructing the jury that "In law an accused person is insane when he has such an abnormal mental condition produced by any cause as renders him at the time of doing that act unable to distinguish between right and wrong in respect to that act and not aware of the nature and quality of the act which he is doing and unconscious that the doing of the act will make him subject to punishment." Whether this be an erroneous statement of the law, it is not

one to be commended. The law finds correct expression in the statement that a person is insane "when he has such an abnormal mental condition produced by any cause as renders him at the time of doing that act unable to distinguish between right and wrong in respect to that act." If the instruction had stopped there it would have been correct, but the court added "and not aware of the nature and quality of the act which he is doing." If by this latter statement the jury was required to find an additional element not included within the phrase first above quoted, its correctness is to be doubted. However, we think the two phrases express exactly the same thing, but in different language. They are synonymous, and their conjunctive use results only in emphasis. If a person is unable to distinguish between right and wrong in respect to an act, he must be unaware of the nature and quality of the act which he is doing, and the same may be said of the concluding phrase "and unconscious that the doing of the act will make him subject to punishment." The three phrases taken together merely emphasize the true rule that "in law an accused person is insane when he has such an abnormal mental condition produced by any cause as renders him at the time of doing that act unable to distinguish between right and wrong in respect to that act." While it may be doubted whether the other two phrases add anything in the way of clarity to the first, they place no greater burden upon the accused than does the first, standing alone.

In *Schissler v. State,* 122 Wis. 365, 99 N. W. 593, an instruction defining insanity to mean "such perverted condition of the mental and moral faculties as to render the person incapable of distinguishing between right and wrong, or unconscious at the time of the nature of the act he is committing," was approved. In order to approve that instruction, the phrase "unconscious at the time of the nature of the

act he is committing" must have been construed as synonymous with "incapable of distinguishing between right and wrong." · And in *Oborn v. State,* 143 Wis. 249, 126 N. W. 737, Mr. Justice MARSHALL, speaking for the court, declares that "the term 'insanity,' as used in the special plea in a criminal case, means such abnormal mental condition, from any cause, as to render the accused at the time of committing the alleged criminal act, incapable of distinguishing between right and wrong and so unconscious at the time of the nature of the act which he is committing and that commission of it will subject him to punishment." This statement plainly implies that if one is incapable of distinguishing between right and wrong it necessarily follows that he is unconscious of the nature of the act which he is committing and that commission of it will subject him to punishment. We think this is the idea which the instruction complained of conveyed to the jury and that its use imposed upon the defendant no greater burden than would the rule tersely stated in *M'Naghten's Case,* 10 Cl. & F. 200, cited in *Oborn v. State,* 143 Wis. 249, at p. 273 (126 N. W. 737), where it was held that if the accused was conscious that the act was one which he ought not to do, and if the act was at the same time contrary to law, he was punishable, he was legally sane. This definition makes the only test that of whether the accused at the time of the commission of the act "was conscious that the act was one which he ought not to do." While amplification such as was indulged in the charge here under consideration may serve as emphasis, whether it really tends to clarity rather than confusion well may be doubted. In view of this doubt, and in view of the sanction which the cases cited give to the amplification of the terse statement which undeniably embodies the correct rule, it cannot be said that the instruction constituted prejudicial error. We may say, however, that the

element of unconsciousness that the doing of the act will make him subject to punishment, has no place whatever in a definition of legal insanity. He may be unconscious that the act will subject him to punishment because he does not know the law, but the fact that one does not know the law is no evidence of one's insanity. The rule laid down in *M'Naghten's Case* is, that "if the accused was conscious that the act was one which he ought not to do, and if the act was at the same time contrary to law, he was punishable," he was legally sane. Whether he knows that the act is contrary to law cuts no figure. He is punishable if he was conscious that the act was one which he ought not to do if the act was contrary to law. However, as used in the charge under consideration it is plain that the unconsciousness meant was the unconsciousness resulting from his inability to distinguish between right and wrong.

Our conclusion with reference to this portion of the charge makes it unnecessary to consider a later statement found in the charge where the court seems to have laid a heavier burden upon the State to prove sanity than the law requires. This part of the charge is discussed in the appellant's brief only to negative the inference that it counteracted the alleged error in that portion of the charge just disposed of. It is not contended that the latter statement prejudiced the defendant, for which reason we give it no further consideration.

The defendant is a Jew. His victim, a member of the police force of the city of Madison, was reputed to be a member of the Ku Klux Klan. At the time of entering upon the trial, and before the drawing of the jury, the trial judge summoned counsel for both sides to his chambers, and there instructed them that he would not tolerate any questions upon the *voir dire* examination of the jury as to whether prospective jurors were members of the Ku Klux

Klan. It is apparent that under the circumstances it was important that the defendant know whether prospective jurors were members of the Ku Klux Klan; if for no other purpose, to enable him intelligently to exercise his peremptory challenges. The interests of justice also required that the order of the Ku Klux Klan, rather than the defendant, should not be placed upon trial, and that the prejudices then rampant and virulent with reference to the Ku Klux Klan should be kept out of the trial so far as possible. It was a most appropriate matter for conference between court and counsel, to the end that extraneous issues and considerations should be excluded from the case and the real issue tried upon its merits. The court did permit counsel for defendant to freely inquire whether prospective jurors were members of any secret organization, whether they were conscious of any prejudice against the Jewish race, and whether they were in sympathy with any organization, or any philosophy or belief, holding that a man of the Jewish race is not entitled to the full enjoyment of American citizenship. Although defendant's counsel were permitted to pursue this line of examination, such queries were propounded to very few of those who eventually constituted the jury. A consideration of the *voir dire* examination of those who were eventually accepted as jurors leaves no reason to believe either that any of them were members of the Ku Klux Klan or that the defendant was in any manner prejudiced because the *voir dire* examination was thus circumscribed. Every juror accepted was asked the question whether he belonged to any secret organization and answered that he did not. Many of those rejected were not asked the question at all. Upon the record we are not confronted with the situation that might have arisen had any of the prospective jurors admitted that they were members of a secret organization. What defendant's rights would have been under such a situa-

tion we are not called upon to consider. It is sufficient to say that the record contains no intimation that the defendant was prejudiced by reason of the limitation which the court imposed upon the *voir dire* examination.

It is further urged that the experts called to testify concerning the insanity of the defendant at the time of the commission of the act were prejudiced, for which reason they could not respond to the purpose of the statute. This is based upon the fact that prior to their being called to testify concerning the insanity of the defendant at the time of the commission of the act, they had expressed their views concerning his sanity at the time of the trial. If such a contention be upheld, it would require the appointment of two sets of experts where not only the sanity of the defendant at the time of the trial, but his sanity at the time of the commission of the act, is called in question. Such a contention finds no basis in the statute nor in reason. The examination made by the experts to determine the sanity of the defendant at the time of the trial is an aid to rather than a disqualification of their opinions upon the question of his sanity at the time of the commission of the act. The first section of the act plainly authorizes the appointment of these experts to testify at the trial whenever expert opinion evidence becomes necessary or desirable. This is certainly sufficiently broad to enable the same set of experts to testify generally concerning their technical subject upon the trial of the case, no matter whether the insanity, for example, of a defendant upon one or another occasion is involved.

There are many other assignments of error, some involving rulings on evidence, and others bearing upon the attitude of the court towards the defendant's counsel, by reason of which attitude, it is said, the defendant was prejudiced before the jury. As to many of these rulings on evidence it is conceded that, even though they be error, they cannot in and of themselves be deemed so prejudicial as to neces-

sitate a reversal. To deal with each of these alleged assigned errors seriatim would unduly extend this opinion without any good purpose. Many of them are exceedingly trivial, and none of them possess striking merit. So far as the attitude of the court towards defendant's counsel is concerned, we may say that an examination of the record impresses us with a most commendable effort on the part of the court to give to the defendant a fair and impartial trial. We are not impressed as counsel seems to be with the thought that the court was at any time unfair to defendant's counsel. The defendant's counsel were neither weak nor supine. They are known for their ability and their aggressiveness. It was the duty of the court to keep the trial under the control of the court and to maintain its dignity. This called for a degree of firmness on the part of the court which we think was exercised with commendable consideration. A review of the entire case satisfies us with the justice of the result.

We have discussed those assignments of error which we feel merit discussion. That we do not specifically deal with others is not to be taken as an indication that they have not been examined or that we have not given them due weight in our disposition of the case. We have no doubt of the fairness of the trial or the justice of the result, nor do we find any error upon which a reversal of the judgment should or could be predicated.

*By the Court.*—Judgment affirmed.

A motion for a rehearing was denied, without costs, on October 14, 1930.