SIMECEK, Plaintiff in error, vs. THE STATE, Defendant in error.

*May 21—June 16, 1943.*

*W. T. Doar* of New Richmond, for the plaintiff in error.

For the defendant in error there was a brief by the *Attorney General, William A. Platz,* assistant attorney general, and *Theodore A. Waller,* district attorney of Pierce county, and oral argument by *Mr. Platz.*

FOWLER, J. James Simecek was prosecuted for murder upon an information charging him in four separate counts with the killing in immediate succession of four persons on the 15th day of January, 1942. A jury was waived. There were pleas of "Not guilty because insane," and "Not guilty."

The court found the defendant sane at the time of the commission of the acts charged, and guilty of murder in the first degree of the killing of each of the four persons and sentenced him to imprisonment for life in the state's prison upon each count, the terms to run concurrently.

The four homicides were definitely proved and the defendant freely admitted that he committed them. The only defense claimed is that the finding of the trial judge that the defendant was sane at the time the homicides were committed is not proved beyond a reasonable doubt. This claim is based upon the following propositions: That the acts of the defendant as detailed by himself and as shown by the bodies of his victims were so utterly atrocious and so gruesome as to preclude reasonable inference that they were committed by a sane person; that there was no motive for the defendant to commit the crimes; that the acts were committed during a temporary period of mental "blackout;" that the family history of defendant showed that he was subject to epilepsy and insanity; and that the competent opinion evidence is that the defendant committed the homicides when in an epileptic seizure and was at the time insane.

The nature of the defense requires a somewhat detailed statement of the evidence. The defendant was twenty-one years of age at the time of the commission of the homicides and unmarried. He attended a parochial school in Chicago through the eighth grade and then attended the Hyde Park high school. The victims of the homicides were Verna Petan, aged twenty-seven years, and her three children, George, Neil, and Sylvia, aged respectively ten, six, and three years. The homicide was committed at the home of Verna and her husband in the absence of the husband. The defendant lived with his mother and sister on a farm about four miles from the Petan farm. There had never been any trouble between the Petan and the Simecek families. On the day of the murders there was a justice court trial in Ellsworth between the mother

of the defendant and a neighbor. The defendant in the morning drove the mother and sister to Ellsworth to attend the trial. The mother did not want the defendant present at the trial on account of his nervousness, although he had personal knowledge of the material facts at issue. The defendant left his mother and sister at Ellsworth and drove the automobile home. About 11:30 o'clock he visited the Petans, was invited to dinner but stated that he had had his dinner and was going to Ellsworth. The husband of Verna and another man were cutting wood on the Simecek farm and were both at the Petan home during the visit referred to. The defendant drove to Ellsworth. The trial was not over and he returned home, again leaving his mother and sister. After 3 o'clock in the afternoon a neighbor passing the Petan home noticed the house was on fire and on going in noticed the smell of kerosene and found the body of the mother and two younger children dead on the kitchen floor. The body of the oldest boy was later found in the basement. Mrs. Petan had bullet wounds in the left lung and had been stabbed. Sylvia's skull was fractured and her neck stabbed. Neil, the six-year-old boy, had a depressed skull fracture, a punctured lung, and a stab in the heart. The body of the other boy was so burned as not to indicate the nature of his wounds. Later in the day a county traffic officer, Miller, saw the defendant at the Simecek home, asked him if he knew the Petan's home had been burned and the Petans murdered. The defendant said he knew nothing about it and had been home all day. Miller noticed some spots on the defendant's shirt and asked him what they were. The defendant said they were blood from a calf born that morning. The officer asked him to remove his shirt and on so doing noticed a spot on his undershirt. Scientific tests later showed these spots to be of human blood. The officer then arrested the defendant and he was taken to jail, and on the day of his arrest a stenographer was called and the district attorney and Miller questioned the defendant. On being asked what he

did with the bodies of the children after he stabbed them he said he laid them on the kitchen floor beside their mother. Asked what he did with the kerosene can he said he carried it from the kitchen to the other room and there was a day bed in the corner, and he threw the kerosene on the bed and started the fire. He said he went to Petans in the afternoon; had always been on friendly terms with the Petans; he had never taken a liking to Mrs. Petan; he liked her as a friend but was not in love with her and had never been in love with any woman; that he did not have any gun except a rifle and did not have a knife.

The next day Tierney, assistant chief of police of St. Paul, interviewed him at the jail. On being asked about the knife he carried in his overall pocket he said he used it. On being asked whom he killed first he said the oldest boy and detailed his acts as follows: He called the boy upstairs and struck him with the gun on the head; the mother ran upstairs when the boy made an outcry; she screamed and ran downstairs and he went after her and as she was about to go out of the kitchen door he shot her and walked over to where she was and used the knife; the two smaller children came in from outdoors and he stabbed them; he then went upstairs and stabbed the other boy and set fire to the bed on the first floor. On being asked what he did with the gun and knife the defendant said he put the gun in the dresser drawer in a storeroom of his home, and put the knife in the stove in the shed at his home. Officers later found the knife where he said he put it, but the gun was not in the dresser drawer. The mother on request turned the gun over to an officer.

Tierney testified that the defendant said he set the place on fire to destroy the evidence, and on being asked said he used kerosene to set the fire. Tierney further testified that the defendant on being asked if when he talked with Mrs. Petan in the morning he didn't want to have relations with her and he said "I guess that's why I came back," and further said that

when he took the boy upstairs he didn't think of his shouting or screaming when he hit him. Another statement was taken from the defendant on the afternoon of the day after the murders, and in it he practically repeated the details as testified by Tierney. He then stated he didn't go to Petan's in the morning with the idea of being alone with Mrs. Petan; was sorry it happened. In answer to the question "Then you expected to have some close relation with the wife?" he answered "May be;" and when asked "But when you say 'may be' you really mean 'yes' " he answered "Yes." All these statements of the defendant were concededly voluntarily made without duress or promise and on being informed of his right to refuse to answer questions.

Two days after these interviews, after being removed from the Ellsworth jail to the jail at Hudson, the defendant wrote a two-page statement in his own handwriting prefaced with the statement that he had made it "without being told what to write." In the first page the defendant details minutely all his acts on the morning of the homicides prior to his first going to Petans and goes on : "Arrived home and started feeding up. After feeding up I left and arrived at the Petans at 11 :40 and talked about the weather, canning, the itch the boy had, until Art [Mr. Petan] and Melvin [the other wood chopper] came home at 12 :10." The second page is also headed "I wrote this without being told what to write." The second page details happenings minutely after leaving the Petans for Ellsworth and from it it appears that he learned "the trial would last all day" and he left word "to have Frank Roach bring my mother and sister home on the way home. Passing the Petan's I saw Art and Melvin at the spring getting water. Stopped and told two neighbors that the trial would last all afternoon and went home. About twenty minutes later went back to Petan's. Had gun [revolver] in pocket; talked about trial and Pulk [party adverse to his mother in the lawsuit]. Then went upstairs with the eldest boy and hit him over the head. He

cried out and his mother ran to the head of the stairs and saw him. Started screaming and ran downstairs. At this point everything seemed to go hazy. As I ran after her and fired she fell on her back by the stove and all I could think of was that they mustn't talk, so I stabbed them all in the heart, then poured kerosene on the bed in the other room and set it on fire, and then came home and put the gun and knife away."

In defense the mother of the defendant testified that she had a brother who was adjudged insane and committed to an insane asylum and he had been therein since 1936. He went insane when about the age of defendant. A brother of her husband with a mental weakness was in a private sanatorium at St. Paul. He had fainting spells and epileptic fits. A brother of the mother also had epileptic fits. The oldest sister of defendant in 1926 got off a bus in Chicago and had forgotten where she lived. When brought home by the police she did not seem to know the members of her family for a while. Prior to the homicides the defendant at times complained of awful headaches. He had been overheard talking to himself in the barn, and had sat in the barn staring for hours at a time. He thought Pulk, the plaintiff in the lawsuit against his mother, was encroaching on his rights.

Dr. Kamman, a specialist in nervous and mental diseases, and a teacher of such diseases in the University of Minnesota for over ten years, testified as to examining into the Simecek family history, and talked with the defendant about all his previous experiences and all his acts on the day of the homicides. The doctor related what the defendant said to him. To questioning by the doctor as to how he felt since in jail the defendant stated he "felt well except for blackouts" lasting two to four seconds, which defendant stated had come on once in a month or two for two or three years, during which he had to hold on to something. These the doctor stated resembled a form of epilepsy. The "blackouts" came on more frequently lately and particularly on getting up from a couch.

On "mental examination" the doctor "found no evidence of insanity." The outstanding features of the defendant's condition were "first, the lack of emotional reaction, and, second, the lack of concern over the whole situation. There was what we call a blunting of the emotional state. . . . There was no evidence of any physical disease." The doctor gave as his opinion that "at the time he [defendant] killed these people he was having what we call an epileptic equivalent . . . an epileptic seizure resulting in a sudden discharge of nervous energy which comes on abruptly." In such a seizure "the uncontrollable desire to kill which is unmotivated so far as any conscious motivation is concerned is almost an automatic act during part of which he is not aware of what he is doing." The facts and circumstances related "evince an unbalanced abnormal or diseased mind." The doctor further testified that assuming the facts stated in the hypothetical question on which his opinion was based, from those facts and the family history and his examination of the defendant it was his opinion "that the defendant was not mentally responsible for his acts and deeds" at the time he committed the homicides.

The doctor also testified that dementia praecox is a form of insanity; that it starts to show itself in the teens or twenties; that defendant has many symptoms which might be early symptoms of dementia praecox; and that there are more persons in institutions with dementia praecox than all other mental conditions put together.

On cross-examination the doctor testified that he did not think the defendant is insane, and as follows: "I think all the time he [defendant] was conscious of what he was doing he was conscious of the fact that it was wrong. All the while that he was in control of himself he knew the difference between right and wrong. I don't think there is any doubt about that." He was aware of the nature and quality of what he was doing "all the time that he knew what he was doing, but [except] during his amnesia period . . . although we have to

qualify that by saying that in spite of the fact an epileptic knows what is wrong they have a compulsion to do it and they can't resist it."

Dr. Kamman was the only expert witness produced by the defense. We are of the opinion that considering all the facts in evidence and giving to Dr. Kamman's testimony all the credit that the trial judge was bound to give it, the trial judge was justified in believing beyond a reasonable doubt and finding that the defendant was sane when he committed his homicidal acts. This would be true even if all of the expert witnesses produced in rebuttal concurred with Dr. Kamman in the opinions above stated by him expressed, although it is to be said in passing that none of them expressed agreement with his opinion that the homicidal acts were committed during an epileptic seizure. We shall go no further in recital of evidence. We have already gone too far in that respect in deference to the manifest conviction of defendant's counsel that the defendant was insane at the time of the commission of the homicides. Even the matter of want of motive, which counsel concedes is not essential to conviction where criminal acts are clearly established, was found against the defendant by the trial judge and we cannot say that the finding is not warranted. The defendant's written statement indicates that the homicidal acts as to the oldest boy had been committed before he "went hazy" and there was no "mental blackout" before that if any at all. We consider that the findings of the trial judge are entirely warranted.

It is to be borne in mind that under the settled law of this state insanity from a medical standpoint does not necessarily constitute legal insanity in the sense that it constitutes a defense in prosecutions for crime. One may be medically insane and yet be criminally responsible for his acts. This idea is clearly expressed in *Oborn v. State,* 143 Wis. 249, 251, 126 N. W. 737, decided in 1910, wherein the opinion and the syllabus were written by Mr. Justice MARSHALL. Pars. 18, 19,

and 20 of the syllabus correctly express the holding of the court in that case:

"18. The term 'insanity' in the law, means such an abnormal condition of the mind, from any cause, as to render the afflicted one incapable of distinguishing between right and wrong in the given instance and so rendering him unconscious of the punishable character of his act.

"19. A person is not immune from punishment for a wrongful act if he has, at the time of perpetrating it, capacity to distinguish between right and wrong in respect thereto,—if he has such capacity and is conscious of the wrongfulness of his conduct.

"20. The law does not recognize a form of insanity in which there exists capacity to distinguish between right and wrong and consciousness of the wrongful nature of the particular act, without power to abstain from it; *i. e.*, in law he who can distinguish between right and wrong must, at his peril, choose rightly between them."

The law as there stated has ever since been adhered to. The latest case so holding is *State v. Johnson,* 233 Wis. 668, 671, 290 N. W. 159. There is no need for reiteration or discussion of this rule.

Complaint is made in the defendant's brief that the court erred in receiving testimony of Dr. Dawson, one of the physicians whom the court appointed to examine the defendant and report whether the defendant was at the time of the trial insane, so that he should not be put upon trial. The appointment was made upon application of defendant's counsel under sec. 357.13, Stats. The defendant had made certain statements on inquiry by the doctor and the doctor had told the defendant that his statements would not be disclosed unless the court should require their disclosure. At the trial the court ordered their disclosure. It is claimed that under sec. 325.21 the doctor could not legally be required to disclose them. The statute only prohibits disclosures of a patient

made to a physician to enable the physician to serve him professionally. The relation of physician to patient did not exist in the instant case and the statute has no application. As to the power of the court to require the disclosure we know of no law prohibiting it and none is cited. The evidence was properly received.

Counsel also contends that it was error to sentence the defendant on each one of the four counts. This was proper.

Counsel also contends that if the court could find the defendant sane the sentence should have been for murder in the second degree because there was not the premeditated design essential to murder in the first degree. Besides the point that a sane person is presumed to intend the natural consequences of his acts, the defendant's statements clearly show a premeditated design to kill.

*By the Court.*—The judgments and sentences of the circuit court are affirmed.