Kwosek, Plaintiff in error, v. State, Defendant in error.

*November 6, 1959—January 5, 1960.*

For the plaintiff in error there was a brief and oral argument by *LaVern G. Kostner* of Arcadia.

For the defendant in error the cause was argued by *William A. Platz,* assistant attorney general, and *John C. Quinn,* district attorney of Trempealeau county, with whom on the brief were *John W. Reynolds,* attorney general, and *Robert J. Vergeront,* assistant attorney general.

BROWN, J. The first assignment of error is that the trial court committed prejudicial error in refusing to permit

the defendant to cross-examine the psychiatrist employed by the state as to his employment by the state before seeing or examining the defendant. Plaintiff in error made an offer of proof that the witness was retained by the state before the witness had seen or examined Kwosek. The offer contained nothing which would support even an inference that the doctor had agreed before examining Kwosek to support the state's contention that Kwosek was sane when he killed his wife. Unless there is some advance authority given the doctor by the state, one does not see how the psychiatrist could obtain access to Kwosek or examine him or reach any conclusion. The mere time of employment, which is all the offer of proof contains, is immaterial. We find no error in excluding the cross-examination on that point.

The second assignment is that the court permitted the state to put in evidence the written confession of December 6, 1957, and also the "substantially identical" oral confession of December 9th.

In both confessions Kwosek's shooting was deliberate. In that respect the confessions were substantially identical. But there were many variations in them concerning Kwosek's activities the day before. For instance, in one he said he borrowed the gun on December 5th and kept it in the car until late in the evening when he took the gun into the bedroom. In the other he said he had owned the gun since he bought it in 1946 and kept it in the attic until he and his wife had risen on December 6th. Then, he said, he climbed up on a chair into the attic and brought the gun down just before he used it.

Plaintiff in error contends that the jury became prejudiced by hearing twice what his counsel calls "the gory details." We think no error was committed. It is largely a matter of discretion for the trial court to determine how many witnesses may testify to the same event, though the

event involves unpleasant details. When the evidence becomes merely cumulative, the trial court may refuse to hear additional witnesses on the same subject. Even if the two confessions were identical in every respect, we would find that there was no abuse of discretion in admitting the evidence concerning them, the confessions being made at different times and one being oral and the other by written, signed statement.

For the time being, we postpone consideration of the next assignment of error. The one following that is:

"4. Did the trial court commit prejudicial error in permitting Dr. Robert L. MacCornack, Jr., to testify, over objection, as to his observations of defendant at approximately 6:30 p. m. on the day of the shooting, which was at the time the doctor was examining and treating the defendant?"

The material part of the statute on which the objection is based is:

"325.21 COMMUNICATIONS TO DOCTORS. No physician or surgeon shall be permitted to disclose any information he may have acquired in attending any patient in a professional character, necessary to enable him professionally to serve such patient, except only (1) in trials for homicide when the disclosure relates directly to the fact or immediate circumstances of the homicide, (2) in all lunacy inquiries, (3) . . . , (4) with the express consent of the patient, . . ."

The witness was a physician called by the sheriff to treat Kwosek. The state called the witness to testify to information he acquired in attending the patient in a professional capacity. Kwosek's counsel made timely objection that:

"I am going to object to any testimony relative to the observation which the doctor made on the basis it is a violation of the patient-physician privilege. We are willing to waive it as to what the doctor administered, but object to any testimony as to his conclusions or observations."

The trial court overruled the objection. Dr. MacCornack testified to the patient's condition, the treatment, and the quieting effect of the drug given. None of the testimony relates to the fact or the immediate circumstances of the homicide (statutory exception (1)). While it may be argued that the defense based on insanity is a lunacy inquiry, and as such is an exception to the privileged character of the doctor's testimony (statutory exception (2)), we doubt that this trial is a lunacy inquiry such as the statute means. Counsel did not refer in his brief to that exception, and we do not decide that point. We ground our conclusion that if there was error in admitting the doctor's testimony no prejudice to Kwosek came from it. His counsel submits:

"The prejudicial effect in the admission of the evidence is that the testimony of the physician lends credence to the theory of the state, particularly on the insanity issue."

Counsel does not print any part of the doctor's testimony, but we have read all of it in the record. We do not find anything there to substantiate counsel's contention. Rather, the convulsive shaking which the doctor observed seems to us to favor the defense of plaintiff in error. Whether it did or not, lay witnesses observed and testified to the same thing and there is no dispute in them whereby testimony by the physician might overcome contrary testimony by other witnesses.

Kwosek's next contention is that the evidence does not support the conviction of murder in the first degree. We have read not only the appendix of plaintiff in error but the complete record and find the evidence to be overwhelming in support of the verdict.

We revert to an assignment of error the consideration of which we postponed, *supra*. The issue as stated by plaintiff in error is:

"3. Did the trial court commit prejudicial error in giving conflicting instructions to the jury on the law applicable to insanity as a defense?"

In charging the jury the court instructed three times on the defense of insanity, viz.: (1) If the jury has a reasonable doubt as to defendant's sanity at the time of the shooting then it is the jury's duty to find him not guilty because insane at the time of the commission of the alleged offense; (2) if, on the other hand, you fail to find the defendant insane, or if there remains any reasonable doubt in your minds of defendant's sanity, etc., then you cannot find the defendant not guilty because insane; (3) if, after the most careful and conscientious consideration of all the evidence, there remains in the jury's mind any reasonable doubt as to the sanity of the defendant at the time of the commission of the offense, then you will find that he was insane, otherwise you will find that he was sane. In the event that you find the defendant was insane at the time of the offense then you will return the verdict not guilty because insane.

Obviously, the instruction which we designated (2) was erroneous. We cannot assume that it was a reporter's error, not heard by the jury rather than a slip of the tongue by the trial judge, which the jury did hear and pay attention to. We have recently treated the subject of an erroneous instruction in combination with a correct one in *Ackley v. Farmers Mut. Automobile Ins. Co.* (1956), 273 Wis. 422, 425, 78 N. W. (2d) 744. There we said:

". . . the confusion resulting from a clearly erroneous instruction is not cured by injecting a proper rule, especially when not given in such a manner as could be expected to correct a mistaken impression. An erroneous instruction on a given subject is not cured by the fact that the law is correctly stated elsewhere, for it cannot be known whether the jury have been guided by the correct rule or by the erro-

neous one. At no time in the instructions given to the jury did the court specifically or necessarily withdraw or qualify the instruction in question; and it is the rule that this is reversible error. *Yerkes v. Northern Pacific R. Co.* 112 Wis. 184, 191, 88 N. W. 33. In *Schmidt v. State,* 124 Wis. 516, 519, 102 N. W. 1071, it was said: 'An erroneous instruction is not cured, nor the presumption of prejudice therefrom overcome, by a correct statement of the law on the same subject elsewhere in the charge.' "

*Ackley* was a civil case. How much more necessary it is to observe that sound rule in a criminal and particularly in a capital case! We consider that there was prejudicial error in the charge to the jury and a new trial is required.

Finally, plaintiff in error asks us in the name of the interests of justice to change the definition of legal insanity. The definition for many, many years has been that which the trial court gave in its instructions to the jury:

"The term insanity in the law means such an abnormal condition of the mind from any cause, as to render the afflicted one incapable from distinguishing between right and wrong in the given instance and so rendering him unconscious of the punishable character of his act.

"A person is not immune from punishment for a wrongful act if he has, at the time of perpetrating it, capacity to distinguish between right and wrong with respect thereto, if he has such capacity and is conscious of the wrongfulness of his conduct."

This is generally referred to as the M'Naghten rule.

Plaintiff in error did not ask any instruction on the subject of legal insanity but now asks us to disavow the M'Naghten definition and substitute the so-called Durham definition, *Durham v. United States* (1954), 94 U. S. App. D. C. 228, 241, 214 Fed. (2d) 862, 874, 45 A. L. R. (2d) 1430. That rule says:

"It is simply that an accused is not criminally responsible if his unlawful act was the product of mental disease or mental defect."

We do not choose to make the change. In addition, we consider that the evidence is such that the use of the Durham rule would not change the result of this trial.

*By the Court.*—Judgment reversed. Cause remanded with directions for a new trial.

HALLOWS, J. (*concurring*). The appellant has urged upon this court a need to re-examine the test of insanity in criminal cases in the interest of justice. There is merit to this argument. The M'Naghten rule as applied in Wisconsin should be modified and changed.

This court has been committed to the M'Naghten rule, commonly called the right-and-wrong test, which was formulated over one hundred years ago in *M'Naghten's Case* (1843), 10 Clark & F. 200, 209, 8 Eng. Reprint 718. As originally stated the accused was not legally responsible if he was "laboring under such a defective reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong." This test applied to the accused's lack of knowledge of right and wrong in respect to the specific act challenged and of its nature and quality, but in practice the test has sometimes been stated to the jury in the abstract and conversely in the affirmative as a test of sanity. See *Wilson v. State* (1956), 273 Wis. 522, 78 N. W. (2d) 917. Although the M'Naghten rule has been subject to much criticism, it is still the test in the majority of states, but in several of them the rule has been modified or supplemented by the irresistible-impulse test. See Anno. 45 A. L. R. (2d) 1447, Criminal Law Irresponsi-

bility. The *M'Naghten Case* was an attempt to state a legal standard in terms of the nature of man, of his mental process, and of his moral responsibility. It is considered defective in that it emphasizes only the cognitive and omits the volitional aspect of man's nature and is not in keeping with present-day thinking of medical science.

In *Oborn v. State* (1910), 143 Wis. 249, 272, 126 N. W. 737, after a review of the earlier Wisconsin cases, this court reaffirmed the M'Naghten rule and rejected the irresistible-impulse modification of it saying: "This court is not committed to the doctrine that one can successfully claim immunity from punishment for his wrongful act, consciously committed with consciousness of its wrongful character, upon the ground that, through an abnormal mental condition, he did the act under an uncontrollable impulse rendering him legally insane. One, at his peril of punishment, commits an act while capable of distinguishing between right and wrong, and conscious of the nature of his act. He is legally bound, in such circumstances, to exercise such self-control as to preclude his escaping altogether from the consequences of his act on the plea of insanity, though his condition may affect the grade of the offense. Thus far the charity of the law goes and no farther." This reasoning assumes that one who has knowledge of right and wrong and of the nature of the act, necessarily has the power or capacity of choice or self-control.

In *Jessner v. State* (1930), 202 Wis. 184, 231 N. W. 634, the original M'Naghten rule was somewhat modified and, so far as the inability to distinguish between right and wrong in respect to the specific act, was affirmed, but doubt was expressed as to the correctness of the additional element of the rule referring to the lack of knowledge of the nature and the quality of the act. *Oehler v. State* (1930), 202 Wis. 530, 535, 232 N. W. 866, stated the rule to be "such a perverted condition of the mental and moral faculties as to render the

person incapable of distinguishing between right and wrong." In *State v. Johnson* (1940), 233 Wis. 668, 290 N. W. 159, in answering the argument that the right-and-wrong test was abolished by ch. 620, Laws of 1917, when "or feeble-minded" was added to sec. 357.11, Stats., now sec. 957.11, governing pleas of insanity, this court again reaffirmed the right-and-wrong test, including the element relating to the nature and quality of the act, stating (p. 670) : "It does not follow, however, that one of less mental caliber than another but still knowing the nature of his act and whether it is right or wrong is to be excused from responsibility therefor." In *Simecek v. State* (1943), 243 Wis. 439, 447, 10 N. W. (2d) 161, this court said: "One may be medically insane and yet be criminally responsible for his acts."

In the latest expression of this court in *State v. Carlson* (1958), 5 Wis. (2d) 595, 93 N. W. (2d) 354, it was stated that some members of the court were of the opinion that the M'Naghten rule should be modified but since the question was not raised it should not be decided in that opinion. However, the court in passing upon the admissibility of evidence stated (p. 607) : "We are of the opinion, however, that if the offered testimony, together with other expert testimony, had sufficiently tended to prove that at the time of the offense defendant was subject to a compulsion or irresistible impulse by reason of the abnormality of his brain, the testimony should have been admitted. Even under the right-wrong test, no evidence should be excluded which reasonably tends to show the mental condition of the defendant at the time of the offense." By the language in the *Carlson Case* we did not adopt the irresistible-impulse test, but the case does cast doubt upon the *Johnson* and *Oborn* decisions.

It is important and necessary that the law of criminal responsibility in this state should be clarified in keeping with

such present medical and psychiatric knowledge as is in accord with basic principles of criminal responsibility and with the respective duties of the court and jury. No test should require the court or the jury to abdicate their functions by allowing medical witnesses and psychiatrists to determine the ultimate fact on theories and standards unrecognized and unapproved by law.

In 1953, a royal commission in England in its report on capital punishment, 1949–1953, reported that the M'Naghten rule was so defective that the law on the subject ought to be changed. The majority was in favor of total abrogation of the rule, leaving the jury to determine whether at the time of the act the accused was suffering from a disease of the mind (or mental deficiency) to such a degree that he ought not to be held responsible. The difficulty with this test is a lack of the definition of the word "ought" to guide the jury. Three members of the commission believed the rule should be extended to add that if at the time of the act as a result of a disease of the mind (or mental deficiency) the accused was incapable of preventing himself from committing it, he was not responsible.

In 1954, the old New Hampshire test was rephrased in *Durham v. United States* (1954), 94 U. S. App. D. C. 228, 241, 242, 214 Fed. (2d) 862, 874, 45 A. L. R. (2d) 1430. This rule is "simply that an accused is not criminally responsible if his unlawful act was the product of mental disease or mental defect." This decision in suggesting instructions under the rule stated that an accused suffering from a mental disease or defect would still be responsible for his unlawful act if there was no causal connection between such mental abnormality and the act. Perhaps causation is what is meant by the ambiguous word "product" in the test. If it is, the formulation of the rule ought to state it expressly and to what required degree. Moreover, the deci-

sion expressly contemplates leaving the ultimate question of fact to the jury to apply its ideas of moral responsibility in each case to the individual prosecuted for the crime. "The jury's range of inquiry will not be limited" and would "be guided by wider horizons of knowledge concerning mental life. The question will be simply whether the accused acted because of mental disorder."

The Durham rule, while paying lip service to "freedom of the will," is so broad that it ceases to be a practical and workable test under the jury system. While the subject of much discussion and hailed by some psychiatrists, generally those of the psychoanalytical school, the Durham rule has not been followed by some eight state and two federal circuit courts which have had the occasion to re-examine this question. Over fifty years before the *Durham Case,* this court rejected the "product test" in *Eckert v. State* (1902), 114 Wis. 160, 89 N. W. 826.

The Durham rule's great weakness is that it provides no legal standard by which a jury can test conflicting medical and psychiatric testimony or by which the jury can evaluate such opinions. Psychiatrists differ radically in their theories of mental illness, of the nature of man, and of the mental process. They range from those who contend all criminals are insane in some sense of the word and no one is responsible for his acts, to those who believe man is endowed with the power of self-control which may be destroyed or impaired by a mental disease or defect through no fault of his own. The determinists and some psychoanalysts consider man's actions to be so influenced or controlled by urges, impulses, and the subconscious as to be caused or determined without any power within man to control or choose his course of conduct in any situation. Other psychiatrists believe that man is a highly complex, integrated personality with the power of self-choice and determination, and whose

mental process has a unity of perceiving, apprehending, judging, and willing which may be interfered with by a disease or defect of the mental order through no fault of his.

Criminal law and responsibility are based upon the fact that an individual human being is mentally free to exercise a choice between possible courses of conduct in respect to those acts condemned by the law and therefore morally and legally responsible. A human being has inherently and within himself a free will—the power of self-control. In those situations when the volitional power is impaired to such a degree or is totally destroyed or the requisite psychological conditions are not present for the exercise of a free choice, because of mental disorder or defect, responsibility for such act should not be imputed to that person. The original M'Naghten rule deals with two requirements for the free exercise of the will—knowledge and reason. Lacking either, the will is not free. But there are other conditions of the mind which affect the freedom of choice. The mind does not function in departments but as an integrated whole. The various steps involved in the mental process which produces a physical act are affected differently by various mental diseases and defects, and differently in many individuals. A test of legal insanity must include the essence of insanity. No one-sentence definition has been devised which is entirely satisfactory. But for legal purposes, the standard should include those effects on the mental process caused by mental disease or defect which have a direct relation to the justice of the conviction.

One who has the power in a given situation to choose between the doing or the not-doing of an unlawful act and freely chooses to do the unlawful act must be held criminally responsible in our society./ And, conversely, if the accused did not have such volitional capacity because of its total or substantial destruction or of its inability to function freely in a given situation, either in the light of knowledge

or because of the lack of it, and such incapacity was caused by and was the result of a mental disease or defect, such individual is not criminally responsible for such act and is legally insane. However, in cases when the normal functioning of the will is affected temporarily because of the overpowering influence of passion or emotion which the accused might have and ought to have controlled, such person should be criminally liable. A person cannot knowingly allow his emotions, urges, and passions to take control of him. Such so-called irresistible impulses are merely unresisted urges.

The concept of man's freedom of self-control is in accord with the basic theory of criminal law to punish those who ought to be punished. This test is not based on any new idea, but it enlarges the present concept of insanity in criminal cases in this state by including and emphasizing the volitional factor in human conduct expressly as a part of the test of insanity. It acknowledges that the volitional faculty in man is a prime element of criminal responsibility and the lack of it or the inability to exercise it freely as the essence of legal insanity when caused by a mental disease, or defect, and not self-induced by emotions or impulses which the accused might have controlled.

Somewhat-similar tests, but perhaps broader in their wording stressing the volitional aspect of criminal responsibility, are stated in *Parsons v. State* (1886), 81 Ala. 577, 585, 2 So. 854, 859, as follows: "No one can deny that there must be two constituent elements of legal responsibility in the commission of every crime, and no rule can be just and reasonable which fails to recognize either of them: (1) Capacity of intellectual discrimination; and (2) freedom of will," citing many cases, and in *State v. White* (1954), 58 N. M. 324, 330, 270 Pac. (2d) 727, 731, which followed the minority view of the royal commission on capital punishment and added to the M'Naghten rule the following: "(c) Was incapable of preventing himself from committing it."

See 22 University of Chicago Law Review, 317–404, for a series of articles by law professors and psychiatrists under the caption, "Insanity and the Criminal Law—A Critique of *Durham v. United States.*" There is also a collection of the cases and a discussion of the problem in 45 A. L. R. (2d) 1447.

The most-satisfactory statement of our views in rule form and the one which should be adopted is formulated in the Model Penal Code of the American Law Institute and favored by a substantial majority of its council. Draft 4, sec. 4.01 of the Model Penal Code provides (p. 27):

"(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.
"(2) The terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct."

I am authorized to state that Mr. Justice CURRIE and Mr. Justice DIETERICH concur.

FAIRCHILD, J. (*dissenting*). There is very little evidence suggesting that mental illness or defect caused defendant to kill his wife. There is so little evidence that in my opinion the inadvertent error in instructions given upon the issue of the insanity defense was not prejudicial. If some test more liberal than the M'Naghten test be proper, the evidence suggesting mental illness or defect was so slight that failure to instruct on the more-liberal test would not be prejudicial. I would affirm the judgment.

I am authorized to state that Mr. Chief Justice MARTIN and Mr. Justice BROADFOOT join in this dissent.