THE STATE OF OHIO *v.* COLBY.

[Cite as State v. Colby, 6 Ohio Misc. 19.]

(No. 83131—Decided March 25, 1966.)

Court of Common Pleas (Criminal Branch) of Cuyahoga County.

*Mr. John T. Corrigan,* prosecuting attorney, *Mr. George J. Moscarino* and *Mr. Leo Spellacy,* for plaintiff.

*Mr. Gerald S. Gold* and *Mr. Thomas H. Barnard, Jr.,* for defendant.

*Per Curiam.* A jury having been waived, the defendant in this case was tried for first degree murder before Judges John M. Manos, John L. Angelotta and Donald F. Lybarger.

The basic facts in the case, established either by direct or circumstantial evidence, are fairly simple. On August 24, 1965,

the defendant, a Shaker Heights housewife, without any rational motive, shot and killed an eight year old neighbor boy, a sometime playmate of her own nine year old son, with a revolver held approximately two inches from the back of his skull. The child had come to the defendant's home at her suggestion at about 8.30 a. m. to identify a jacket which was believed to be his. The defendant immediately concealed the dead body in her station wagon; drove to a wooded area ten minutes away; placed the child's body there; fired into the ground the rest of the shells in the revolver; went shopping; returned home and concealed the gun in three pounds of ground beef in the bottom of a deep freezer; and burned the coat in which the boy's body had been wrapped. When suspicion was directed toward her she gave the police and others several conflicting versions of what happened on the morning in question, including one that her own son had shot the boy accidentally and two peculiar narrations claiming that she shot the victim accidentally. Upon indictment for first degree murder, and at her arraignment thereafter, the defendant pleaded not guilty and not guilty by reason of insanity.

On trial the evidence revealed that there had been some friction between defendant and the family of the deceased child because the latter's parents preferred that their boy not play so often with defendant's son since they felt he was a "slow learner," somewhat childish and aggressive. The defendant resented this attitude and expressed her feelings rather openly in this regard. However, the evidence is that on the day of the homicide she called to invite the neighbor child to a birthday party for her son.

At the end of the state's case the court, ruling on a motion, held that the state had established a *prima facie* case of first degree murder.

The defendant did not take the stand. Her witnesses were two eminent psychiatrists and two clinical psychologists who, in the judgment of the court, established by the greater weight of the evidence that about fourteen years ago the defendant had suffered a traumatic emotional episode which, aggravated by other incidents since then, led the experts to diagnose that she for a long time had been suffering from a chronic schizophrenic reaction—paranoid type—which progressively was becoming

more pronounced, and that she was so afflicted on the day of the tragic homicide.

The state also relied upon two outstanding psychiatrists and a psychologist. One diagnosed defendant as a border-line person, between normal and psychotic, stating she has suffered from mental illness and that in a medical sense her ability to choose right from wrong "was seriously threatened." He said guardedly that in the simplest terms of right and wrong she *appeared* to operate as if she knew right from wrong. He further stated that one could "not rule out that defendant's distorted thinking played a part in the act itself."

A second psychiatrist for the state diagnosed the defendant as a passive-aggressive personality aggressive type, who was at no time psychotic, and who was responsible for her act on the day of the homicide.

Now the court noted that after each of the psychiatrists had completed narrating his observations and conclusions concerning the mental condition of the defendant, based upon many and varied signs and symptoms of significance to specialists in their field, each doctor was asked to compress his final conclusion into the straight jacket popularly known as the M'Naghten Rules, that is, the knowledge of right and wrong test, as applied in Ohio since *Clark* v. *State* (1843), 12 Ohio 483.

The court is well aware that at the present time the legal test of insanity in Ohio "is a *test of responsibility rather than a medical test as to insanity.*" 27 Ohio Jurisprudence 2d 618, Homicide, Section 76. The test is thus defined: "The general test as to responsibility where insanity is set up as a defense is whether the *accused's mind was so afflicted with disease as to render him incapable of distinguishing between right and wrong* as to the particular act done and as of the time when the act was done." Id. 620, Section 77. Ohio has said that the accused "must prove by a preponderance of the evidence that at the time of committing the act he was laboring under such defective reason from disease of mind as not to know the nature or quality of the act he was doing, or if he did know it, he did not know it was wrong." Id. 620, Section 77. (Emphasis added.)

In the instant case it was obvious that in answering the key questions the psychiatrists were doing what their brethren have been doing for years in Ohio under similar circumstances,

namely, arriving at their respective conclusions as to the defendant's sanity in as scientific a manner as is possible today, and then answering the key question (to conform to existing necessity).

The court must emphasize that in the instant case all the accustomed formalities of framing and answering the classic Ohio questions as to insanity were complied with. Thus the present test for insanity in a criminal case was followed. On the basis of the psychiatrists' replies thereto, the court judged that defense had proved by the greater weight of the evidence that the defendant was not guilty by reason of insanity. That ended the case.

The court is convinced, however, that, having carefully examined into all facets of the "right and wrong" test, it has a duty to speak out on the subject of Ohio's legal test for insanity in criminal cases. Unless and until some trial court under proper circumstances has the courage to point the way to a better method of submitting to the triers of the facts the issue of the insanity of the accused when insanity is tendered as a defense, then Ohio will continue to adhere to criteria which more and more are challenged as being false.

The court has reached the conclusion that the present "right and wrong" test, the M'Naghten rules, for deciding criminal responsibility is "based on an entirely obsolete and misleading conception of the nature of insanity, since insanity does not only, or primarily, affect the cognitive or intellectual faculties, but affects the whole personality of the patient, including both the will and the emotions. An insane person may therefore know the nature and quality of his act and that it is wrong and forbidden by law, and yet commit it as a result of the mental disease." (Report of the Royal Commission on Capital Punishment, 1949-53, Cmd. No. 8932 at pg. 80.)

For many years the American Law Institute has been working upon a Model Penal Code, the final draft of which was issued in 1962. In the Code, Section 4.01 provides as follows:

"A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law."

This court is of the opinion that the American Law Insti-

tute formula would not permit introduction of the defense of irresistible impulse, a doctrine that the courts of Ohio have not recognized as a test of criminal liability, without first applying the standard test for insanity. (See 27 Ohio Jurisprudence 2d 622, Homicide, Section 79.) The American Law Institute formula retains all that is of value in *M'Naghten*: it rests on responsibility and it tests the accused's attitude toward and recognition of right and wrong. But it permits a test of mentality on the basis of "substantial capacity" and "appreciation," (words that embrace far more meaning than the language used in *M'Naghten*) and it contemplates that a psychiatrist may give an opinion based on all the facts that go to make up awareness and understanding.

The American Law Institute test was adopted in the case of *United States* v. *Freeman*, 357 F. 2d 606, decided in the U. S. Court of Appeals, Second Circuit, February 28, 1966. The comment of Judge Kaufman (page 622) is significant:

"The gravamen of the objections to the M'Naghten Rules is that they are not in harmony with modern medical science which, as we have said, is opposed to any concept which divides the mind into separate compartments—the intellect, the emotions and the will. The Model Penal Code formulation *views the mind as a unified entity and recognizes that mental disease or defect may impair its functioning in numerous ways.* The rule, moreover, reflects awareness that from the perspective of psychiatry absolutes are ephemeral and gradations are inevitable. By employing the telling word 'substantial' to modify 'incapacity,' the rule emphasizes that 'any' incapacity is not sufficient to justify avoidance of criminal responsibility but that 'total' incapacity is also unnecessary. The choice of the word 'appreciate,' rather than 'know' in the first branch of the test also is significant; *mere intellectual awareness that conduct is wrongful, when divorced from appreciation or understanding of the moral or legal import of behavior, can have little significance.*" (Emphasis added.)

We commend to fellow judges who must deal with the perplexing problem of a defendant who may not be responsible for his criminal act, a careful study of the *Freeman case.* Finally, in our judgment, these words near the end of that decision (page 624) make sense:

"* * * All legal definitions involve elements of abstraction

and approximation which are difficult to apply in marginal cases. The impossibility of guaranteeing that a new rule will always be infallible cannot justify continued adherence to an outmoded standard, sorely at variance with enlightened medical and legal scholarship. No one would suggest that a physician-expert called to state an opinion with respect to a litigant's orthopedic or neurological condition should be restricted in his reply to a single isolated cause to the exclusion of other relevant and important findings and conclusions—much less to concepts developed at the outset of Victoria's reign. In a criminal trial, when life and liberty hang in the balance, such arbitrary limitations on expert and jury are all the less defensible.

"The genius of the common law has been its responsiveness to changing times, its ability to reflect developing moral and social values. Drawing upon the past, the law must serve—and traditionally has served—the needs of the present. In the past century, psychiatry has evolved from tentative, hesitant gropings in the dark of human ignorance to a recognized and important branch of modern medicine. The outrage of a frightened Queen has for too long caused us to forego the expert guidance that modern psychiatry is able to provide."