STATE, Respondent, v. SHOFFNER, Appellant.

*March 4—July 1, 1966.*

416

For the appellant there was a brief by *James M. Shellow* and *Shellow & Shellow*, all of Milwaukee, and oral argument by *James M. Shellow*.

For the respondent the cause was argued by *Paul T. Miller*, assistant district attorney of Milwaukee county, and *William A. Platz*, assistant attorney general, with whom on the brief were *Bronson C. La Follette*, attorney general, and *Hugh R. O'Connell*, district attorney.

FAIRCHILD, J. 1. *The defense of insanity.* In instructing the jury, the learned circuit judge faithfully followed our decision in *State v. Esser* [1] and defined the defense of insanity in terms of capacity to understand the nature and quality of the act and capacity to distinguish between right and wrong with respect to it.

The defense had requested, in preferential order, four alternative instructions. The elements involved in each were as follows:

The first: Lack of substantial capacity to appreciate criminality of conduct or lack of substantial capacity to conform conduct to the requirements of law. [2]

[1] (1962), 16 Wis. (2d) 567, 599, 115 N. W. (2d) 505.
[2] The American Law Institute, Model Penal Code, Proposed Official Draft, May 4, 1962, p. 66, sec. 4.01.

The second: Lack of substantial capacity to conform conduct to the requirements of law.[3]

The third: Whether the accused was suffering from disease of the mind to such a degree that he ought not to be held responsible.[4]

The fourth: Whether the act is the product of mental disease.[5]

As appears in the statement of facts, there was expert testimony tending to establish elements of the defense which are not included in the *Esser* definition, *i.e.*, lack of substantial capacity to conform conduct, and the offense a product of the mental illness. Thus we are again presented with the problem we resolved by bare majority vote four years ago in *Esser*.

As noted in *Esser*, the question faced by society when a mentally ill person engaged in offensive conduct made punishable by law is:

". . . whether at the time of engaging in the offensive conduct the accused was dominated or affected by the mental illness to so substantial a degree that society cannot, in good conscience, hold him responsible for the conduct as a crime, *i.e.*, punish him." [6]

Conceivably the jury could be instructed that the plea of insanity raised that question and the jury must answer it, thus permitting the jury to function as the conscience of the community as well as fact finder.[7]

For various reasons, which we attempted to point out in *Esser*, no solution is perfect, and each alternative can

[3] *United States v. Currens* (3d Cir. 1961), 290 Fed. (2d) 751.

[4] British Royal Commission on Capital Punishment Report (1949–1953), p. 116, par. 333.

[5] *Durham v. United States* (D. C. Cir. 1954), 214 Fed. (2d) 862.

[6] *State v. Esser, supra,* footnote 1, page 585.

[7] Id. at page 596. Two members of the court, Mr. Justice HEFFERNAN and the writer of this opinion, would choose this course if the *Esser* definition were abandoned, and the burden of proof on the issue imposed on the defendant.

be legitimately subjected to some criticism. The majority, in *Esser*, chose the definition involving capacity to understand the nature and quality of the act and capacity to distinguish between right and wrong, pointing out that under the Wisconsin rule on burden of proof, a defendant succeeds if he is able to raise a reasonable doubt concerning his capacity to do so.

We also pointed to a lack of evidence that the previously existing right-wrong test, coupled with placing the burden of proof upon the state, had resulted in injustice. We suggested that significance might be found in a study of cases where an attempted insanity defense had been unsuccessful, but the prisoner had later been found in need of treatment for mental illness.

In the four years which have elapsed since *Esser*, no case has come before us in which the record indicated to us that a mentally ill person had been found guilty in violation of good conscience. We have received no information of any other sort tending to demonstrate the likelihood of such result under the *Esser* definition. Judges who preside over criminal trials would be the group most cognizant of instances, if any, where persons whose conduct had been substantially affected by mental illness have been convicted. We are not aware of any indication by Wisconsin trial judges that there have been such instances. There has been no change in the statute which imposes the burden of proof upon the state on this issue.[8]

We are aware that there has been activity in several other jurisdictions concerning the definition of the defense of insanity. The legislatures in Maine, Illinois, and New York have adopted new definitions. In 1961 Maine adopted the following definition:

"An accused is not criminally responsible if his unlawful act was the product of mental disease or mental defect. The terms 'mental disease' or 'mental defect'

---

[8] Sec. 957.11 (1), (2), Stats.

do not include an abnormality manifested only by repeated criminal conduct or excessive use of drugs or alcohol." [9] This definition follows *Durham*.

In the same year, 1961, Illinois adopted the following definition:

"(a) A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.

"(b) The terms 'mental disease or mental defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct." [10] This definition follows the American Law Institute.

A New York study commission proposed this definition:

" '1. A person is not criminally responsible for conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity:

" '(a) To know or to appreciate the wrongfulness of his conduct; or

" '(b) To conform his conduct to the requirements of law.

" '2. As used in this section, the terms "mental disease or defect" do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct.' " [11]

Despite the recommendation of the study commission, which followed the American Law Institute, the New York legislature, in 1965, adopted the following definition:

"1. A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental

[9] 15 Maine Rev. Stats. Anno., pp. 373, 374, sec. 102.

[10] Smith-Hurd Ill. Anno. Stats., p. 213, sec. 6–2, ch. 38.

[11] McKinney's Consolidated Laws of N. Y., Anno., Revised Penal Law, Commission Staff Comments, p. 257, art. 30.

disease or defect, he lacks substantial capacity to know or appreciate either:

"(a) The nature and consequence of such conduct; or
"(b) That such conduct was wrong." [12]

This definition is somewhat modified from *M'Naghten*.

A California special study commission has proposed a modification of the American Law Institute definition. The legislature has not acted on the proposal. The California supreme court considers the *M'Naghten* definition "an integral part of the legislative scheme for the appraisal of criminal responsibility" and that any change should be made by the legislature. [13]

Three federal circuit courts have adopted new definitions of the defense of insanity. [14]

The Michigan supreme court recently indicated that, if properly presented, it would consider the *Durham* definition, [15] and an Ohio court expressed dissatisfaction with the *M'Naghten* definition presently being used in Ohio. [16]

Other courts have adhered to the *M'Naghten* definition. [17]

---

[12] McKinney's Consolidated Laws of N. Y., Anno., Revised Penal Law, p. 14, sec. 30.05.

[13] *People v. Nicolaus* (1966), 48 Cal. Rptr. 353, 409 Pac. (2d) 193.

[14] *United States v. Currens, supra,* footnote 3 (lack of substantial capacity to conform conduct); *Wion v. United States* (10th Cir. 1963), 325 Fed. (2d) 420 (American Law Institute definition); *United States v. Freeman* (2d Cir. 1965), 357 Fed. (2d) 606 (American Law Institute definition).

[15] *People v. Krugman* (Mich. 1966), 141 N. W. (2d) 33.

[16] *State v. Colby* (1966), 35 Ohio Op. (2d) 61, 6 Ohio Misc. 19.

[17] *Chase v. State* (Alaska 1962), 369 Pac. (2d) 997; *State v. White* (1962), 60 Wash. (2d) 551, 374 Pac. (2d) 942, 959; *Spurlock v. State* (1963), 212 Tenn. 132, 368 S. W. (2d) 299; *Dare v. State* (Okla. Crim. 1963), 378 Pac. (2d) 339, 349; *State v. Gramenz* (Iowa 1964), 126 N. W. (2d) 285, 288; *Cole v. State* (Fla. 1965), 172 So. (2d) 898, and *State v. Schantz* (1965), 98 Ariz. 200, 210, 403 Pac. (2d) 521.

One of our assumptions in *Esser* was that:

". . . in any case where a defendant is able to convince a jury that his mental illness totally or substantially deprives him of power to control his conduct, it seems very probable that such showing will generate in the minds of the jurors a reasonable doubt of his capacity to understand the nature and quality of his acts or to distinguish right from wrong." [18]

Such an assumption would be seriously challenged by a record which contained convincing evidence that mental illness did deprive a defendant of substantial capacity to conform his conduct to the requirements of law and yet a jury convicted.

Although there was, indeed, defense testimony that Shoffner was unable to conform his conduct, the record, for reasons which will appear, is not thoroughly convincing on this point.

The defense experts were both employed by the Milwaukee County Mental Health Center, North Division. Dr. Liccione is chief psychologist and Dr. Crowley, a psychiatrist, is clinical director. Both held the opinion that Shoffner is mentally ill, with a type of schizophrenia. Dr. Crowley summarized schizophrenia as "a psychosis characterized by disturbances of affect, perception, association, a predilection for fantasies over reality and consequent inability to adequately test reality. That's all that comes to mind at the moment. It's a very complex thing." He described "affect" as "an emotional response to an idea or situation." The affectual disturbances characterizing the schizophrenic are: "In general inappropriateness of affect, which is an emotional response to a situation or an idea or thought which is not in keeping with that thought such as laughing at a funeral. . . An extension of this disturbance in affect would be a complete absence of it in which the absence

---

[18] *State v. Esser, supra,* footnote 1, page 589.

of it would be inappropriate. That is what was previously referred to as flatness of affect."

Dr. Crowley testified to further opinions (the interrelation of which we as laymen may not fully understand, but which the record gives us no reason to discredit) that Shoffner's antisocial acts were the products of his illness; he would not have committed them but for his mental illness; he had a good fundamental understanding of right and wrong and was aware that it was wrong for him to commit the acts; he lacked substantial capacity to conform his conduct to the requirements of the laws he was alleged to have violated; he did not have real insight into his conduct, and lack of insight interfered with his moral judgment.

Two psychiatrists, Dr. Tabachnick and Dr. Studley, were appointed by the judge and were examined at the trial pursuant to sec. 957.27, Stats. They testified, concerning Shoffner, only in terms of the *Esser* test. Each stated, in response to questions by the court, opinions that Shoffner was "sane," that he had sufficient mental capacity to understand the nature and quality of his acts, and to distinguish between right and wrong with respect to such acts. Neither court nor counsel asked their opinions whether Shoffner was suffering from a mental disorder, as to the characteristics and symptoms of such disorder, if any, nor concerning the way and degree in which the malady, if any, affected Shoffner's behavior.[19]

Thus this record is not a convincing demonstration that the *Esser* definition fails, for it leaves open the distinct possibility of a conflict between the doctors with respect to Shoffner's mental illness and its effect on his conduct.

Speaking now, for a majority of the court, consisting of Mr. Justice GORDON, Mr. Justice BEILFUSS, Mr. Justice HEFFERNAN, and the writer of this opinion, we

[19] See *State v. Esser, supra,* footnote 1, page 593.

have not been convinced that the *Esser* definition, coupled with the rule imposing upon the state the burden of proof beyond a reasonable doubt, is producing unjust results, and we are not convinced that the *Esser* definition should be changed. Mr. Chief Justice CURRIE, Mr. Justice HALLOWS, and Mr. Justice WILKIE would overrule *Esser* and adopt the American Law Institute definition notwithstanding the present statutory rule on burden of proof.

At this point, the writer of this opinion finds himself in an unusual situation. Agreeing, as he does, with three of his brethren that the *Esser* definition, coupled with the burden of proof on the state is all that a defendant can demand as a matter of right, and disagreeing, as he does, with the other three, who support the present adoption of the American Law Institute definition as a matter of right, he concludes that it would be appropriate, at least as an experiment in this perplexing field, to extend to a defendant, under certain conditions, an option to assume the burden of proof on the insanity issue, and to be tried under a more liberal definition, and to order a new trial in the instant case. The other three justices support this view provided that the option is restricted to the American Law Institute definition.

Accordingly, the remainder of part 1 of this opinion is adhered to by Mr. Chief Justice CURRIE, Mr. Justice HALLOWS, Mr. Justice WILKIE, and the writer.

We consider it unfortunate, in the trial of the instant case, that the court-appointed experts testified only in the strict terms of the *Esser* test. If, by responding that Shoffner is "sane," they meant that, to a medical certainty he was not suffering from the type of schizophrenia diagnosed by the defense experts, this is not clear from the record. We consider it particularly unfortunate that the court-appointed psychiatrists were asked to state whether Shoffner was "sane," since that term comprises all of this most perplexing legal issue,

and the standing of these witnesses as court-appointed experts, examined, indeed, by the court may well have strongly impressed the jurors, and distracted them from full consideration to the disturbances described by Dr. Crowley which might have raised a reasonable doubt of Shoffner's sanity.

Had the court-appointed experts stated opinions in the same frame of reference as the defense experts, the record would surely have been more instructive to the jury, and to us, upon review. The doubts we have on this point would be insufficient, however, as a basis for ordering a new trial in the interests of justice.

We consider a new trial appropriate here, however, in order to give defendant Shoffner the benefit of the option hereinafter described, although he has been unsuccessful in persuading a majority of the court that he is entitled to the benefit of the American Law Institute definition as a matter of right.

In *Kojis v. Doctors Hospital* [20] we made a new rule prospective only except for the case in which we reached the decision to change the rule. We there quoted with approval *Molitor v. Kaneland Community Unit District No. 302,* [21] as follows:

"At least two compelling reasons exist for applying the new rule to the instant case while otherwise limiting its application to cases arising in the future. First, if we were to merely announce the new rule without applying it here, such announcement would amount to mere dictum. Second, and more important, to refuse to apply the new rule here would deprive appellant of any benefit from his effort and expense in challenging the old rule which we now declare erroneous. Thus there would be no incentive to appeal the upholding of precedent since appellant could not in any event benefit from a reversal invalidating it."

---

[20] (1961), 12 Wis. (2d) 367, 374, 107 N. W. (2d) 131, 107 N. W. (2d) 292.

[21] (1959), 18 Ill. (2d) 11, 163 N. E. (2d) 89, 97.

We see no good reason why a particular defendant may not waive the benefit of the rule which imposes the burden of proof upon the state beyond a reasonable doubt. Accordingly, we direct that where a defendant pleads not guilty by reason of insanity, presents evidence that as a result of mental disease or defect (other than an abnormality manifested only by repeated criminal or otherwise antisocial conduct) he lacks substantial capacity to conform his conduct to the requirements of law, desires to be tried under the American Law Institute definition of the defense of insanity, and is willing to carry the burden of proof on the issue, he is to be permitted to waive such provisions of sec. 957.11 (1) and (2), Stats., as place the burden of proof on the insanity issue on the state, and have the jury instructed in terms of the American Law Institute definition. This option is to be available to Shoffner upon retrial, as well as to defendants in other cases not yet tried.

Such waiver should be written, signed by defendant and his counsel, and filed with the court before trial, with notice to the district attorney, along with a written request for appropriate instructions based on the American Law Institute definition of the defense of insanity [22] and an instruction that defendant has the burden, to satisfy or convince the jury, on this issue, to a reasonable certainty, by the greater weight of the credible evidence.[23]

## SUMMARY

A majority of the members of this court (Justices GORDON, BEILFUSS, HEFFERNAN, and FAIRCHILD) agree that the definition of the defense of insanity to which a defendant is entitled as a matter of right, the burden

[22] See sec. 4.01, Model Penal Code, quoted in footnote 40 of *State v. Esser, supra,* footnote 1, page 587.

[23] See Wis J I—Civil, Part 1, 200.

of proof on the issue being, by statute upon the state, is the *Esser* definition.

A majority of the members of this court (Chief Justice CURRIE, and Justices HALLOWS, WILKIE, and FAIRCHILD) agree that a defendant may have the option hereinbefore described, and agree that there be a new trial in this case, and that the defendant may exercise the option at the new trial.

In the views hereinafter expressed, in parts 2 to 6, inclusive, the members of the court are of one mind.

2. *Alleged error in refusal of instructions.* The court refused to instruct, as requested by defendant, that:

". . . if you find the defendant not guilty by reason of insanity, he will not be released. If he is found to be not guilty by reason of insanity, he will be committed by this Court to the central state hospital or to some other institution designated by the State Department of Public Welfare and will be detained there until this Court in an appropriate mental examination shall determine that the defendant is sane and mentally responsible and further shall find that he is not likely to have a recurrence of insanity or mental irresponsibility such as would result in criminal acts." [24]

The instruction is adapted from one which is approved in the District of Columbia.[25]

The giving of this instruction is inconsistent with the ordinary rule that a jury is not to be informed of the effect of its answers upon the rights or liabilities of the parties. But we think an exception is justified in this difficult field because of the possibility that if the jurors are ignorant of the hospitalization required by statute and believe that a finding of not guilty by reason of insanity will free the defendant, they may be biased against such finding. We would prefer that the instruc-

[24] Sec. 957.11 (3), (4), Stats.
[25] *Lyles v. United States* (D. C. 1957), 254 Fed. (2d) 725. See also *McDonald v. United States* (D. C. 1962), 312 Fed. (2d) 847.

tion be given, although we do not deem it prejudicial error not to have done so.[26]

Defendant requested an instruction that in order for the jury to be convinced that defendant understood the nature and quality of his acts, "You must believe beyond a reasonable doubt that the defendant at the time he committed these acts had real insight into his conduct; that he was able to appreciate and evaluate these acts; that he was able to make normal moral judgments about them." This instruction was refused.

The proposed instruction was based upon a portion of our opinion in *Esser, supra*. We there said, in discussing the element of understanding the nature and quality of the act: "Suppose that one vaguely realizes that particular conduct is forbidden, but lacks real insight into the conduct. He may be furtive about such conduct, but not really able to make a normal moral judgment about it." We then pointed to expert testimony in the *Esser* record which we felt tended to create a reasonable doubt that he could appreciate and evaluate his act and to show that at the time of the killing Esser did not understand the nature and quality of his acts.

There is somewhat similar expert testimony in the *Shoffner Case*. Defense counsel could very properly argue to the jury that Shoffner's lack of insight into his conduct raised a reasonable doubt of his understanding the nature and quality of his acts, but we do not consider that he was entitled to an instruction by the court as requested.

3. *Alleged error on voir dire*. Defendant challenges rulings which prevented his counsel from obtaining answers to four questions on *voir dire*. Since the case will be tried again, the questions will undoubtedly not arise in the identical posture, and none of the rulings involve

---

[26] See *Bean v. State* (Nev. 1965), 398 Pac. (2d) 251, 256.

a principle of substantial importance, we do not deal with this challenge.

4. *Alleged failure of proof of arson.* The circumstances of Shoffner's entering into the home where he set fires have been reflected in the statement of facts. His momentary decision and its motivation, negativing consent, appear from his own statement. Mr. Buetemeister, who owned and occupied the home, testified that he had not given permission to anyone to start fires. Mrs. Buetemeister, who owned the home jointly with her husband, did not testify. Defense counsel contends that because the state did not produce testimony that Mrs. Buetemeister did not consent, the state failed to prove that Shoffner had damaged the "building of another without his consent." [27]

Sec. 943.02 (2), Stats., defines "building of another" as "a building in which a person other than the actor has a legal or equitable interest which the actor has no right to defeat or impair, even though the actor may also have a legal or equitable interest in the building." Under that definition it may be enough in any case to prove that one co-owner did not consent, particularly where, as here, such co-owner was in possession. Be that as it may, however, the only reasonable inference which can be drawn from the undisputed facts in this case is that Shoffner acted without the consent of any owner.

5. *Alleged failure to prove venue with respect to the burglary.* Through oversight, the state failed to produce testimony that the situs of the burglary was in Milwaukee county. Defense counsel challenges the propriety of the court's taking judicial notice of certain facts in order to remedy the deficiency. Because there will be a new trial, where the oversight can be avoided, we need not consider the point.

6. *Alleged error in admitting Shoffner's statements.* As reflected in the statement of facts, Shoffner was

---

[27] Sec. 943.02 (1) (a), Wis. Stats.

arrested shortly after 12:30 a. m., October 23, 1964. He was taken to the office of the district attorney about 3 p. m., and taken before a county judge, where he was represented by counsel, still later that afternoon. A very few minutes after arrest, he made an incriminating statement, and he made statements concerning a substantial number of offenses thereafter, only a few of which are directly involved in this case.

Defense counsel moved in advance of trial to suppress these statements, and challenges them on appeal on the ground that the first statement preceded any warning concerning the right to remain silent and right to counsel, that the first statement contaminated all the subsequent ones, and that the interrogation was unreasonably and unnecessarily long.

The circuit court denied the motion to suppress, orally stating findings which appear of record. In substance they were as follows:

Shoffner was nineteen, had been a graduate of a high school in the upper third of his class. He took part in athletics, had an interest in writing poetry and playing chess. He was employed (as messenger or copy boy) for a newspaper, and liked it. He was calm and cooperative during the interrogation, volunteered information. There were some 44 crimes involved.

He had no prior experience with police, but had seen an attorney, who was his guardian, four or five times. The court considered the interrogation unnecessarily long, but that it resulted because of Shoffner's willingness to talk about a very long series of violations.

There were no physical pressures used, suggested, or threatened. He did not have a bed in which to lie down and sleep, but dozed off a few times.

The arresting officer, by reason of his observations of the car driven and then abandoned by Shoffner, had probable cause to arrest. One or two police officers did intersperse their interrogation with the advice that Shoffner need not answer questions, and with asking

him whether he wanted a lawyer. Shoffner never intimated he wanted a lawyer. The court was somewhat skeptical whether this advice was given in the order testified to, but felt the state had met the burden of proof, even though Shoffner denied it.

The circuit court stated that there could be only one conclusion; that the statements were the product of the free and unrestrained will, and were voluntary beyond a reasonable doubt.

We have reviewed the testimony taken on the motion to suppress, and are in accord with the findings of the learned trial court. In most respects the finding that the statements were voluntarily given is supported by Shoffner's own testimony. He did claim that he confessed to some offenses he did not commit because he was tired and wanted to get rid of the officers. He conceded, however, that he was given food and coffee, was permitted to rest when he wanted to, that he declined an offer to lie down if he wanted to, that he told the officers something to the effect that he was happy he was caught. Although he testified on direct examination that he was not informed he was not required to talk and was not told he had the right to call an attorney, he conceded that some of the officers might have said that anything he said could be used against him, might have told him he had the right to call an attorney, and that one of the officers might have told him that because of the seriousness of the charges he should have an attorney.

Apparently defense counsel does not take issue with the findings of the court with respect to the voluntary nature of the statements, except to the extent of the two challenges above mentioned, the challenge to the first incriminating statement, which admittedly was made before any warning as to his rights, and to the length of the interrogation.

Officer Perlewitz, the arresting officer, described the first statement as follows:

"*A.* At that time I took him to the call box, and as I picked up the phone to call for a squad to assist me. I heard that there was the robbery at the Bite-A-Wee Restaurant. At this time I asked for assistance. I turned to defendant, and I said: 'Do you know what else you are under arrest for?' And he said: 'Yes, I just held up the restaurant on Green Bay Avenue across from George Webb's.' I said: 'And where did you get the car?' He said: 'I stole it.' I said—at this time the squads came, we put him in the squad, and I told him that he didn't have to say anything, that anything that he said might be held against him, and he had a right to call a lawyer.

"*Q.* And at this time when you told him this, where was this? *A.* At the call box there as we were going into the squad.

"*Q.* This is prior to getting into the squad? *A.* Just as we were going into it."

Shoffner denied this conversation, but testified that after he was in the car, the officers asked where he had gotten the money he had on his person and "I told them that I had got it from the restaurant."

This trial took place before June 13, 1966, when the supreme court of the United States decided *Miranda v. Arizona.*[28] Under the principles applicable to trials before that date, we would not consider it a denial of due process to admit proof of defendant's answer to the officer's question under the circumstances. Since this case is to be retried, the admissibility of any statements of defendant offered by the state should be determined by the trial court under the principles of *Miranda.* It appears from the present record that the defendant's statement while at the call box was not spontaneously offered by defendant, was made after arrest in response to a question of the officer and prior to warnings on the subjects required by *Miranda* and therefore that such statement will be inadmissible upon a new trial.

[28] (Decided June 13, 1966), 384 U. S. 436, 86 Sup. Ct. 1602, 16 L. Ed. (2d) 694.

With respect to the length of time from arrest until Shoffner was taken before a magistrate and the claim that statements were inadmissible as a result,[29] we agree with the circuit court that the readiness of Shoffner to give information about a large number of offenses affects the determination of the reasonableness of the delay. Although the matter of the restaurant robbery reached an accusatorial stage almost immediately, it appears that much of the time was consumed, first by Shoffner's indicating in response to general questions that he had committed a number of other offenses, by his describing his *modus operandi,* and by a detective looking up a number of complaints where similar methods had been used, and checking them out with Shoffner, one by one. Of the three charges involved in this trial, the written statements concerning the robbery and burglary were written and signed by Shoffner early in the business day, and the investigation of the arson took place later, and was completed shortly before he was taken to the office of the district attorney, at approximately three. There was testimony that Shoffner's guardian, an attorney, was present at the district attorney's office as well as before the magistrate.

Under all the circumstances, we do not consider that the delay rendered the statements inadmissible.

*By the Court.*—Judgment reversed, cause remanded for further proceedings consistent with the opinion on file.

HALLOWS, J. (*concurring*). A half a loaf is better than no loaf. I concur in the concurring opinion of Mr. Justice WILKIE and reiterate the reasons in my concurring opinion in *Kwosek v. State* (1960), 8 Wis. (2d) 640, 100 N. W. (2d) 339, and dissenting opinion in *State v. Esser* (1962), 16 Wis. (2d) 567, 115 N. W. (2d) 505. While I accept the option technique as a half step

---

[29] See *Phillips v. State* (1966), 29 Wis. (2d) 521, 535, 139 N. W. (2d) 41.

in the right direction, I hope the dawn of a new day is not far off when *M'Naghten* will be recognized by this court in its historical context and understood as an outmoded and outdated expression of a test of criminal responsibility and when the court will join the ever-growing band of jurisdictions which accept the American Law Institute's formulation of the only test for criminal responsibility in insanity cases as a realistic expression of what contemporaneous law ought to be.

WILKIE, J. (*concurring*). I agree with reversal and the remanding of the case. I support the important step forward of allowing a defendant, who claims insanity as a defense, the option of assuming the burden of proof on insanity with the accompanying use of the A. L. I. test. I would go further and hold that it was reversible error to use the *Esser*[1] test and would send the case back for a new trial (without the option) under the test prescribed in the Model Penal Code of the American Law Institute.[2] I would do this even though the burden of proof remained with the state.

I realize that the whole subject of the proper definition of insanity in a criminal case was very carefully considered by this court in *Esser* in 1962. The discussions contained therein in the majority opinion by Mr. Justice FAIRCHILD and in the dissents of Mr. Justice CURRIE (now Chief Justice), Mr. Justice HALLOWS, and Mr. Justice DIETERICH (now deceased), thoroughly set forth the reasons for the respective views of the then members of this court. I set forth my views here not only because I am one of the three members of the present court who were not on the court at that time, but also because I consider the court's decision in *Esser* wrong and I think it most important for Wisconsin to adopt the more

---

[1] *State v. Esser* (1962), 16 Wis. (2d) 567, 115 N. W. (2d) 505.

[2] Model Penal Code, Proposed Official Draft, May 4, 1962, p. 66, sec. 4.01, see *infra* footnote 21 at page 441.

progressive A. L. I. test of insanity in criminal proceedings.

I disagree with the *Esser* test for two basic reasons, each dictating that we reject that test and approve the test prescribed in the Model Penal Code.

*First.* In the American system of jurisprudence persons charged with crimes requiring intent or *mens rea* are not held accountable if they are not responsible. From the beginning of our law insanity has been a defense in these cases and if the accused is found insane he is not held responsible for what would otherwise be a criminal act. It is no wonder that lawyers, jurists, legal scholars, psychiatrists and others skilled in the workings of the human mind and personality, criminologists and indeed all persons who have been concerned with the efforts of society to apprehend those who have committed criminal acts and to establish their accountability for these acts, have struggled from the beginning of the common law with the proper definition of insanity. Constant turmoil has surrounded efforts to work out a functioning system for determining who is insane and, therefore, not responsible for his acts, and for dealing with such persons.

Any consideration of the proper test of insanity as a defense to a criminal charge must begin with the so-called *M'Naghten* rule adopted in England in 1843 when Daniel M'Naghten, attempting to assassinate Queen Victoria's prime minister, mistakenly killed his secretary. M'Naghten was acquitted by a jury, and in the course of the review of that case in court, rules were adopted permitting acquittal only when it is proved that:

". . . at the time of the committing of the act, the party accused was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing, or, if he did know it, that he did not know he was doing what was wrong." [3]

---

[3] *M'Naghten's Case* (1843), 10 Clark & F., *200, *210, 8 Eng. Reprint 718.

The evolution of Wisconsin law on the test of insanity was detailed by Mr. Justice FAIRCHILD in *Esser*.[4] As stated in *Esser*,[5] and approved by the majority here,[6] this test limits a finding of insanity to those who, at the time of the commission of the act did not know right from wrong or who were incapable of understanding the nature and quality of the alleged wrongful act. Thus Wisconsin adheres to a test which recently has been abandoned by such outstanding courts as the United States court of appeals for the Second[7] and Tenth[8] circuits.

In an earlier opinion, *United States v. Currens*,[9] the United States court of appeals for the Third circuit labeled the *M'Naghten* rules as "unworkable."[10] Most recently, federal Judge IRVING R. KAUFMAN of the Second circuit, in *Freeman*, detailed some of the most important objections to these rules: (1) They focus "only on the cognitive aspect of the personality, *i.e.*, the ability to know right from wrong,"[11] and the tests do not "permit the jury to identify those who can distinguish between good and evil but who cannot control their behavior."[12] (2) They recognize no degrees of incapacity.

"Either the defendant knows right from wrong or he does not and that is the only choice the jury is given. But such a test is grossly unrealistic; our mental institutions, as any qualified psychiatrist will attest, are filled with people who to some extent can differentiate between right and wrong, but lack the capacity to control their acts to a substantial degree."[13]

---

[4] *State v. Esser, supra*, footnote 1, at pages 570–599.

[5] Id. at page 599.

[6] *State v. Shoffner*, ante, at page 418.

[7] *United States v. Freeman* (2d Cir. 1966), 357 Fed. (2d) 606.

[8] *Wion v. United States* (10th Cir. 1963), 325 Fed. (2d) 420.

[9] (3d Cir. 1961), 290 Fed. (2d) 751.

[10] *United States v. Currens, supra*, footnote 9, at page 765.

[11] *United States v. Freeman, supra*, footnote 7, at page 618.

[12] Ibid.

[13] Ibid.

(3) They place "unrealistically tight shackles" [14] upon expert psychiatric testimony.

"When the law limits a testifying psychiatrist to stating his opinion whether the accused is capable of knowing right from wrong, the expert is thereby compelled to test guilt or innocence by a concept which bears little relationship to reality. . . ."

"Prominent psychiatrists have expressed their frustration when confronted with such requirements. . . ."

"Psychiatrists are not alone in their recognition of the unreality of M'Naghten. As long ago as 1930, Mr. Justice Cardozo observed that 'everyone contends that the present definition of insanity has little relation to the truths of mental life.' [Footnote omitted.] And Mr. Justice Frankfurter, as a witness before the Royal Commission on Capital Punishment, declared with his usual fervor: 'I do not see why the rules of law should be arrested at the state of psychological knowledge of the time when they were formulated. . . . I think the M'Naghten Rules are in large measure shams. That is a very strong word, but I think the M'Naghten Rules are very difficult for conscientious people and not difficult enough for people who say, "We'll just juggle them." ' " [15]

Judge KAUFMAN stated:

"At bottom, the determination whether a man is or is not held responsible for his conduct is not a medical but a legal, social or moral judgment. Ideally, psychiatrists—much like experts in other fields—should provide grist for the legal mill, should furnish the raw data upon which the legal judgment is based. It is the psychiatrist who informs as to the mental state of the accused—his characteristics, his potentialities, his capabilities. But once this information is disclosed, it is society as a whole, represented by judge or jury, which decides whether a man with the characteristics described should or should not be held accountable for his acts. In so deciding, it cannot be presumed that juries will check their common sense at the courtroom door." [16]

[14] *United States v. Freeman, supra,* footnote 7, at page 619.
[15] Ibid.
[16] Ibid.

Thus, he concluded:

"The true vice of M'Naghten is not, therefore, that psychiatrists will feel constricted in artificially structuring their testimony but rather that the ultimate deciders—the judge or the jury—will be deprived of information vital to their final judgment. For whatever the social climate of Victorian England, today's complex and sophisticated society will not be satisfied with simplistic decisions, based solely upon a man's ability to 'know' right from wrong. It is in this respect that the vast strides made in public awareness and acceptance of psychiatry and psychiatric methods may even be more significant than the scientific developments which gave rise to them. Few areas of modern American culture—from the personnel offices of our giant corporations to the pages of our mass-circulation magazines—have been untouched by the psychiatric revolution. In this setting, a test which depends vitally on notions already discredited when M'Naghten was adopted can no longer be blandly 'accepted as representing the 'moral sense of the community.' To continue to apply such medically discarded concepts would be to follow a negative approach which is the result of a hold-over of long outmoded attitudes rather than a policy decision grounded in reason or science." [17]

Thus, to adhere to *Esser* (reaffirming the Wisconsin version of *M'Naghten*) is to cling to an outdated concept of who should be held responsible for the commission of an alleged criminal act. A person who may know right from wrong and who may understand the nature and quality of his act, but who is nevertheless incapable of exercising any freedom of choice as to the commission of the wrongful act is nevertheless considered responsible. Thus, Wisconsin persists in its position that a jury speaking as the conscience of the community in rendering its judgment on the "insanity" of an individual must reject one leading school of medical thought that believes

[17] *United States v. Freeman, supra,* footnote 7, at page 620.

diseased volition can exist apart from diseased cognition.[18]

*Second.* The error of further adherence to the Wisconsin version of *M'Naghten* (as expressed in *Esser*) is further demonstrated by the rule of *State v. Carlson.*[19]

"Even under the right-wrong test, no evidence should be excluded which reasonably tends to show the mental condition of the defendant at the time of the offense."[20]

If such evidence is to be received to the effect that the defendant was not in control of his acts at the time of the wrongful act due to mental illness or defect, it escapes me why the jury ought not to be able to consider such evidence in determining whether the defendant, at the time of the act, was responsible. Why should the jury be restricted in terms of one particular medical approach, *i.e.*, the capacity to know right from wrong and the nature of his acts is all-inclusive and there can be no separate incapacity to control his acts?

The judgment that a person is not considered responsible for his acts which would otherwise be criminal because of his mental condition at the time of the act, is a moral judgment and I have no quarrel with the proposition that the test should be couched in legal terminology rather than in terms of the discipline of psychiatry. The difficulty with *M'Naghten* or *Esser* is that the current Wisconsin test excludes one important index of whether an individual acted responsibly— namely that he may not have had the capacity to make a choice or conform his conduct to the requirements of law. This is an important omission. So important, as in my judgment to invalidate *Esser*.

If Wisconsin is to abandon *M'Naghten* and *Esser*, the test it should adopt is that set forth in the Model Penal Code authorized by the American Law Institute:

---

[18] Hall, General Principles of Criminal Law (2d ed.), p. 524.

[19] (1958), 5 Wis. (2d) 595, 93 N. W. (2d) 354.

[20] *State v. Carlson, supra,* footnote 19, at page 607.

"Article 4. **Responsibility**

"Section 4.01. **Mental Disease or Defect Excluding Responsibility.**

"(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law.

"(2) As used in this Article, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct." [21]

This test best meets the basic requirements of a proper test of insanity as outlined by a leading legal scholar in this field, Sheldon Glueck of the Harvard Law School, in Law and Psychiatry:

"(1) The test must be couched, as far as possible, in such familiar terms as to be an understandable and helpful guide to the average lay jury. (2) It must be just, not subjecting to the stigma of criminal conviction and the punishment of execution or of long imprisonment a defendant whose mental aberration was somehow probably involved in the commission of the prohibited act.

---

[21] The American Law Institute, Model Penal Code, Proposed Official Draft, May 4, 1962, p. 66, sec. 4.01.

The evolution of the A.L.I. test is fully described in *Freeman, supra,* footnote 7, at page 622: "In 1953, a year before *Durham,* the American Law Institute commenced an exhaustive study of criminal conduct including the problem of criminal responsibility. In the ensuing months and years, under the scholarly direction of Professors Herbert Wechsler of Columbia University, its Chief Reporter, and Louis B. Schwartz of the University of Pennsylvania, Co-Reporter, the leading legal and medical minds of the country applied themselves to the task. Gradually and painstakingly a new definition of criminal responsibility began taking shape as Section 4.01 of the Model Penal Code was evolved. Before its penultimate articulation, drafts and redrafts of the section were submitted to and revised by an advisory committee comprised of distinguished judges, lawyers, psychiatrists, and penologists. After committee approval was obtained, successive drafts were debated and considered by the Council, and later by the full membership, of the Institute. Nine long years of research, exploration and consideration culminated in the definitive version of Section 4.01, which was finally adopted by the Institute in 1962."

(3) The test must be fairly in harmony with authoritative conceptions of contemporary psychiatry, and flexible and general enough to take account of new and reasonably well established discoveries in that discipline. (4) It must permit the psychiatric expert witness to state his diagnosis of the accused's probable condition, not in terms of fragmentary, separated symptoms, but as an organic whole arrived at upon consideration of clinically observable symptoms, the patient's past history, and the application of such contemporary scientific investigatory devices as are used in the psychiatric examination of *noncriminal* patients for purposes of diagnosis and prognosis. (5) The test must not demand of the expert that he state his diagnosis either piecemeal or in dogmatic 'Yes' or 'No' terms. (6) The test should not require him to commit himself to a conclusion regarding the *responsibility* of the accused for the crime, but leave that legal (and moral) issue to the judgment of the jury where it belongs. (7) Finally, the test of irresponsibility must be protective of society, not leading to the discharge into the open community of actually or potentially dangerous persons." [22]

The virtue of the American Law Institute test lies in the fact that it (1) disapproves of the concept that divides the mind into separate compartments—"the intellect, the emotions and the will"; [23] (2) views "the mind as a unified entity and recognizes that mental disease or defect may impair its functioning in numerous ways"; [24] and (3) allows "an inquiry based on meaningful psychological concepts" [25] to be pursued.

In rejecting the *Esser* test and in endorsing the A. L. I. test, I have one further comment to make concerning the majority opinion. That opinion states:

"In the four years which have elapsed since *Esser*, no case has come before us in which the record indicated to us that a mentally ill person had been found guilty in violation of good conscience."

---

[22] Glueck, Law and Psychiatry (1962), at page 42.

[23] *United States v. Freeman, supra,* footnote 7, at page 622.

[24] Ibid.

[25] *United States v. Freeman, supra,* footnote 7, at page 623.

This statement begs the question. Actually since *Esser* there have been only three cases in which the issue of insanity was raised in a criminal appeal here.[26] The *Esser* rule was used in the trial of these cases and none of the records in these cases contained any effort to modify the rule. Accordingly, there would have been nothing in any record which in any way could present the fairness of the *Esser* rule as against any other. This is the first such case since *Esser* and as indicated in the majority opinion itself, there was testimony here which would have supported (though not required) a jury finding of "not guilty due to insanity" on the basis of the A. L. I. test if that test had actually been used in instructing the jury. Thus, this becomes the first test since *Esser* that has come to our court in which the *Esser* v. *A. L. I.* test for insanity was crucial.

In talking about the definition of insanity it should be completely understood that in terms of end results in Wisconsin we are largely concerning ourselves with the difference in the institutional treatment of the defendant. As stated in *United States v. Freeman*: [27]

". . . [W]e believe the true choice to be between different forms of institutionalization—between the prison and the mental hospital. Underlying today's decision is our belief that treatment of the truly incompetent in mental institutions would better serve the interests of society as well as the defendant's."

[26] *Brook v. State* (1963), 21 Wis. (2d) 32, 46, 123 N. W. (2d) 535, in which the court refused to adopt a flat rule that persons classified as psychopaths were not insane. *Cullen v. State* (1965), 26 Wis. (2d) 652, 657, 133 N. W. (2d) 284, where evidence was not put in by the defense to rebut the presumption of sanity. *State v. Kanzelberger* (1965), 28 Wis. (2d) 652, 663, 137 N. W. (2d) 419, in which no evidence of mental illness under any other test was offered and the court expressly refused to reconsider the definition upon the record presented.

[27] *Supra*, footnote 7, at page 626.

In the final analysis, in urging the use of the A. L. I. test I do so because I am satisfied that there are certain defendants now found sane who would be found insane and they would be sent for medical treatment rather than being convicted and confined to a penal institution in punishment. The end result would be institutionalization and the procedures under the Wisconsin system of continuing the confinement or allowing the release of persons committed to our mental institutions as criminally insane are rigid enough so that the release of any individual that is dangerous would be amply guarded against.

In fact, in Wisconsin individuals found to be criminally insane are sent to Central State Hospital for the criminally insane at Waupun. Some of the defendants who are convicted (with or without a claim of insanity as a defense) are subsequently transferred from prison where found by the prison staff to be mentally ill. As far as we know there are no public statistics available on the extent of such transfers, although in *Esser*, Mr. Justice FAIRCHILD said:

"We are informed that of the total number of patients on March 31, 1961, (346), 39 percent were committed due to inability to stand trial, 2.6 percent by reason of acquittal on a plea of insanity, 17.9 percent by transfer from prison, and 9.9 percent by commitment after expiration of sentence. We do not know how many of the 27.8 percent who reached the hospital via conviction and subsequent transfer from the prison were convicted after a plea of insanity, nor how many of them might have been found not guilty because insane if a different definition of insanity had prevailed. Whatever the fact in that respect, the figures do show that a substantial number of prisoners are hospitalized for mental illness. A study of these cases would reveal whether there was a real question in any substantial number of cases whether it was just to hold the individuals responsible for their offenses, and might be quite persuasive in deciding whether a broader definition of the defense of insanity ought to be adopted." [28]

---

[28] *State v. Esser, supra,* footnote 1, at page 591.

I submit that it is likely that a significant number of these defendants might have been found insane under the A. L. I. test with the result that they would have immediately been confined for treatment at Central State Hospital rather than being found sane under the *M'Naghten-Esser* test and sent to prison but transferred later because of mental illness. In any event each person in the end would be confined and treated for mental illness.

In essence, I favor the A. L. I. test because it would permit the adjudication of individuals as responsible or irresponsible on a basis consistent with the advances of modern medicine. Certain individuals would be regarded as insane and therefore not responsible for acts which would otherwise have been criminal. This would be entirely consistent with our basic philosophy of holding accountable for crimes only those who are really responsible for their acts, *i.e.*, those who commit these acts with a freedom of choice. At the same time those "insane" persons would be institutionalized and treated as mentally ill, to be released only after they are found by the trial court to be "sane and mentally responsible" [29] and additionally, "not likely to have a recurrence of insanity or mental irresponsibility as will result in acts which but for insanity or mental irresponsibility would be crimes." [30]

GORDON, J. (*dissenting in part*). In preserving the *M'Naghten* rule as fashioned by this court in *State v. Esser* (1962), 16 Wis. (2d) 567, 115 N. W. (2d) 505, the majority opinion has my support. However, I must respectfully dissent from that portion of the court's opinion which gives an option to a defendant to be tried under the American Law Institute definition of insanity.

[29] Sec. 957.11 (4), Stats.
[30] Ibid.

I consider this to be a particularly undesirable manner of backing into the American Law Institute test. The Wisconsin legislature has fixed the burden of proof of insanity on the state by sec. 957.11 (1) and (2), Stats., and it is seriously ill-advised, in my view, for this court, by a bare majority, to upset that legislative direction with an "experiment" such as is outlined in the majority opinion.

In my opinion, the judgment below should be affirmed.

I am authorized to state that Mr. Justice HEFFERNAN joins in this dissent.

BEILFUSS, J. (*dissenting in part*). I join the partial dissent filed by Mr. Justice GORDON and in addition thereto I dissent to those portions of the court's opinion which subject the retrial of the case to the exclusionary rules of *Miranda v. Arizona* (June 13, 1966), 384 U. S. 436, 86 Sup. Ct. 1602, 16 L. Ed. (2d) 694.

In *Johnson v. New Jersey* (June 20, 1966), 384 U. S. 719, 86 Sup. Ct. 1772, 16 L. Ed. (2d) 882, it is stated: "We hold further that *Miranda* applies only to cases in which the trial began after the date of our decision one week ago." (June 13, 1966). In all of our cases, and elsewhere, in considering the problems of double jeopardy, when a new trial has been ordered we have considered it to be but one case, a mere continuation of the original proceeding until the judgment is final.[1] One of the obvious purposes of *Miranda* is to upgrade police practices insofar as affording the accused his constitutional protection. Some practices now prohibited by *Miranda* were legally acceptable at the time of the alleged criminal act, at the time of the custodial interrogation, and at the commencement of his trial. The arrest and interrogation were in October, 1964; the trial commenced in May of 1965. I do not believe it is the intention of *Miranda*

---

[1] *State v. Witte* (1943), 243 Wis. 423, 10 N. W. (2d) 117.

to reach back to challenge otherwise legal police procedures on the dates set forth.

I further dissent from that portion of the majority opinion which suggests it was unfortunate that the medical experts for the state did not express their opinions in reference to the theories and tests of insanity as suggested by the defendant and his medical experts.

The state's medical experts testified in response to questions which limited the inquiry to the *Esser* test—under the law of this state that was the legal test. If the opinions of the state's medical experts would have been of assistance to the defendant he most certainly could have reached them by cross-examination—this he did not do. I know of no rule of law that makes it incumbent upon the state or its witnesses to express opinions beyond the legal definition of the subject under inquiry.

I believe the defendant was fairly tried and convicted upon ample credible evidence and would affirm the judgment.